# UNITED STATES *v.* ZAZOVE.

No. 432.   Argued April 19, 1948.—Decided June 14, 1948.

*Oscar H. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, H. Graham Morison, Paul A. Sweeney, Melvin Richter* and *Philip Elman.*

*Edward H. S. Martin* argued the cause for respondent. With him on the brief was *John B. King.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

We are called upon in this case to determine whether Regulation 3450 of the Veterans' Administration [1] is in accord with a proper construction of § 602 (h) (2) of the National Service Life Insurance Act of 1940.[2]

Respondent, Tillie Zazove, was designated beneficiary in a $5,000 contract of National Service Life Insurance. The insured died in 1943, and the named beneficiary filed her claim for the insurance in the Veterans' Administration. Upon denial of the claim, suit was instituted in the District Court for the Northern District of Illinois.[3] The District Court ruled, on its view of the facts, that Mrs. Zazove did not stand *in loco parentis* to the soldier and hence was not one of the persons who could be made a beneficiary as provided by the statute.[4] On appeal, the Circuit Court of Appeals for the Seventh Circuit ruled to the contrary and remanded for further proceedings. 156 F. 2d 24.

The issue remaining for determination by the District Court upon remand was the validity of Regulation 3450. It sustained the regulation as properly issued pursuant to

---

[1] 6 Fed. Reg. 1162, 1166, 38 C. F. R. 1941 Supp. § 10.3450.

[2] Part I, Title VI of the Second Revenue Act of 1940, Act of Oct. 8, 1940, c. 757, 54 Stat. 974, 1008, 38 U. S. C. §§ 801, 802 (h) (2).

[3] Pursuant to § 617 of the Act, 38 U. S. C. § 817.

[4] § 602 (g), 38 U. S. C. § 802 (g).

the National Service Life Insurance Act. On a second appeal, the Circuit Court of Appeals, one judge dissenting, reversed. 162 F. 2d 443. We granted certiorari to review the important question of statutory construction involved. 332 U. S. 835.

The basic statutory provision involved is § 602 (h) of the National Service Life Insurance Act of 1940, which provides that insurance issued under the Act "shall be payable in the following manner:

"(1) If the beneficiary to whom payment is first made is under thirty years of age at the time of maturity, in two hundred and forty equal monthly installments.

"(2) If the beneficiary to whom payment is first made is thirty or more years of age at the time of maturity, in equal monthly installments for one hundred and twenty months certain, with such payments continuing during the remaining lifetime of such beneficiary."

The Administrator, acting under the general rule-making power given him by the Act,[5] promulgated Regulation 3450 (set forth in the margin)[6] shortly after the enactment

[5] Sec. 608, 38 U. S. C. § 808: "The Administrator, subject to the general direction of the President, shall administer, execute and enforce the provisions of this chapter, shall have power to make such rules and regulations, not inconsistent with the provisions of this chapter, as are necessary or appropriate to carry out its purposes, and shall decide all questions arising hereunder. . . ."

[6] *"Payment to first beneficiary.* Upon due proof of the death of the insured while a National Service Life Insurance policy is in force, the monthly installments, without interest, which have accrued since the death of the insured (the first installment being due on the date of death of the insured) and the monthly installments which thereafter become payable in accordance with the provisions of the policy, shall be paid to the beneficiary or beneficiaries entitled in the following manner:

"(a) If the beneficiary to whom payment is first made is under

of the statute, to put § 602 (h) into operation. The regulation provides, for beneficiaries covered by clause (1), that "payment shall be made in 240 equal monthly installments at the rate of $5.51 for each $1,000 of such insurance." The amount of the monthly installment is so calculated that the sum of the 240 installments equals the face value of the insurance plus 3% interest per annum.

---

thirty years of age at the time of the death of the insured, payment shall be made in 240 equal monthly installments at the rate of $5.51 for each $1,000 of such insurance.

"(b) If the beneficiary to whom payment is first made is thirty or more years of age at the time of the death of the insured, payment shall be made in equal monthly installments for 120 months certain, with such payment continuing throughout the remaining lifetime of such beneficiary. The amount of the monthly installment for each $1,000 of insurance shall be determined by the age of the beneficiary as of last birthday at the time of the death of the insured, in accordance with the following schedule based upon the American Experience Table of Mortality and interest at the rate of 3 percentum per annum:

| "Age of beneficiary at date of death of insured | Amount of each monthly installment |
|---|---|
| 30 | $3.97 |
| . . . | |
| 40 | 4.50 |
| . . . | |
| 50 | 5.39 |
| . . . | |
| 54 | 5.90 |
| . . . | |
| 60 | 6.81 |
| . . . | |
| 68 | 8.19 |
| . . . | |
| 70 | 8.51 |
| . . . | |
| 80 | 9.55 |
| . . . " | |

It is the provision made by the regulation for first beneficiaries covered by clause (2) that is in issue, since the first beneficiary in this case, Mrs. Zazove, was more than thirty years old when the policy matured. For such beneficiaries, who are to receive payments for life with 120 payments certain, the regulation provides that the "amount of the monthly installment for each $1,000 of insurance shall be determined by the age of the beneficiary as of last birthday at the time of the death of the insured, in accordance with [a] schedule based upon the American Experience Table of Mortality and interest at the rate of 3 percentum per annum . . . ." Accordingly, the size of the monthly installment varies not merely with the face value of the insurance policy but also with the age of the first beneficiary, the latter factor being used as the basis of an actuarial computation whereby the face value of the policy plus interest is equalized over the life expectancy of the beneficiary. Under this interpretation of § 602 (h) (2), the respondent, who was 54 years of age at the death of the insured, is entitled to monthly installments of $29.50, at the rate of $5.90 for each $1,000 of insurance in which she had a beneficial interest. These installments are to be paid for 120 months certain,[7] and to continue during her remaining lifetime if she lives beyond that 10-year period.

In reversing the District Court, the Circuit Court of Appeals held this method of calculation set forth by Regulation 3450 to be inconsistent with the provisions of § 602 (h) (2). It construed the latter provisions, in accord with the respondent's contention, as plainly requiring

---

[7] If the first beneficiary fails to survive the 10-year period, after having received at least one installment, "thereafter monthly installments in the same amount shall be paid to the person or persons entitled as beneficiary until all of the installments certain shall have been paid." Regulation 3451, 6 Fed. Reg. 1162, 1166, 38 C. F. R. Cum. Supp. § 10.3451.

that the total of the equal monthly installments payable over a period of 120 months certain should equal the face value of the insurance, plus interest. Under this construction, Mrs. Zazove is entitled to receive $48.08, instead of $29.50, as her monthly installment, so that the total of the 120 payments certain will amount to $5,000 (plus interest), instead of $3,450 (plus interest) as determined by the Veterans' Administration, with the monthly installments due her if she survives the period of guaranteed payments continuing at the same rate. Taking into account Mrs. Zazove's life expectancy as estimated by the American Experience Table of Mortality, the actual cash value of this $5,000 insurance policy at the time of the insured's death would amount to $8,145 under respondent's construction, instead of $5,000 as determined by the regulation.[8]

In arriving at its decision, the majority of the Circuit Court of Appeals reasoned that the terms of § 602 (h) (2) are clear and unambiguous; that nothing is said in the statute about equalizing the sum over the life expectancy of the beneficiary; and that Congress unmistakably prescribed payment of the face value plus interest in equal monthly installments over a period of 120 months certain. The major difficulty with this reasoning lies in the inadequate consideration that it gives to the full extent of the payment provided by § 602 (h) (2). In effect, the Circuit Court of Appeals majority stopped short, in its reading of the terms for payment of the insurance in that subsection, at the end of the phrase "in equal monthly installments for one hundred and twenty months certain." By stopping short at that phrase, the court failed to consider the alternative possibility that Congress intended the immediately following phrase, "with such payments continuing during the remaining lifetime of such beneficiary,"

---

[8] See table, *infra* note 18.

to provide an additional and equally essential component of the statutory equivalent for the face value of the insurance. Assuming that this alternative construction of the section is in fact what Congress intended, the only proper interpretative regulation would be one that computed the value of the monthly installments payable to any given first beneficiary in such a manner that the value of the payments to be made, giving due weight to the beneficiary's life expectancy at the death of the insured, would be equivalent to the face value of the policy, plus 3% interest. Regulation 3450 is based on that assumption. It was only because the Circuit Court of Appeals failed to regard the continuing payability of monthly installments, after the payment of the 120 installments certain, as possibly constituting a significant component of the insurance for which the serviceman had contracted, rather than a sheer gratuity conferred by Congress, that the court could view the subsection as plainly and without ambiguity requiring the face value of the insurance to be paid by the end of the 120 months certain.

Moreover, the very presence of the term "certain" in the phrase "equal monthly installments for one hundred and twenty months certain" suggests a view contrary to that reached by the court below. It will be noted that when Congress had in mind, as it clearly did in the case of § 602 (h) (1), that a fixed number of installments provided for should equal the face value of the insurance, there was no occasion for the use of "certain" in describing the installments to be made and, indeed, the term is not found in § 602 (h) (1). While the inclusion of the term in describing the fixed number of installments to be paid under § 602 (h) (2) might conceivably be a mere superfluity, its presence at least suggests the far greater probability that it was used in the specialized, technical sense in which it is generally employed in the insurance field—namely, to indicate a guaranty that a designated number

of monthly payments shall be forthcoming, where a policy provides an option for equal monthly installments continuing throughout the lifetime of a payee, with the individual installment varying in amount depending on the age of the beneficiary when the policy matures.[9]

Hence, in our view, a reading of § 602 (h) (2) in its entirety suffices to demonstrate that the language there used by Congress is far from being so clear and so free from ambiguity as to preclude the construction adopted by the Veterans' Administration in Regulation 3450. To this extent, we believe the reasoning of the Circuit Court of Appeals was in error. But that alone would not necessarily invalidate its holding since, as the Government appears to concede, the terms of § 602 (h) (2) are not unambiguously in accord with the regulation. Indeed, if the ambiguity inherent in § 602 (h) (2) were found in the terms of an ordinary commercial insurance policy, there might well be substantial ground for construing it in favor of the insured.[10]

There is, of course, a marked distinction between the criteria for judicial construction of an ordinary commercial insurance contract, and construction of the provisions of an act of Congress setting up a system of national life insurance for servicemen to be administered by a governmental agency. The statutory provisions, where ambiguous, are to be construed liberally to effectuate the beneficial purposes that Congress had in mind. In this respect, judicial construction of the statute may appear similar to construction of a commercial policy, where ambiguous provisions are generally construed in favor of the insured. In the latter case, construction favorable to the

---

[9] See examples, in the text *infra,* of standard usage of this term in commercial insurance policies.

[10] See *Aschenbrenner* v. *United States Fidelity & Guaranty Co.,* 292 U. S. 80, 84 *et seq.* (1934); *Manufacturers' Accident Indemnity Co.* v. *Dorgan,* 58 F. 945, 956 (1893).

insured rests on the theory that "The phraseology of contracts of insurance is that chosen by the insurer and the contract in fixed form is tendered to the prospective policy holder who is often without technical training, and who rarely accepts it with a lawyer at his elbow. So if its language is reasonably open to two constructions, that more favorable to the insured will be adopted . . . and unless it is obvious that the words are intended to be used in their technical connotation they will be given the meaning that common speech imports. . . ." [11] But the statute is an expression of legislative intent rather than the embodiment of an agreement between Congress and the insured person. Only the intent of Congress, which in this case is the insurer, need be ascertained to fix the meaning of the statutory terms; the layman understanding of the policy holder does not have the relevance here that it has in the construction of a commercial contract. [12]

On the other hand, we think it clear that an administrative regulation purporting to construe an ambiguous subsection of the National Life Insurance Act of 1940 is not automatically to be deemed valid merely because not plainly interdicted by the terms of the particular provision construed. The Administrator's general rule-making power, which was exercised in issuing Regulation 3450, is limited by the statute to "such rules and regulations, not inconsistent with the provisions of this chapter, as are necessary or appropriate to carry out its purposes . . . ." [13] Moreover, a 1946 amendment to § 608, designed to eliminate the finality of the decisions of the Administrator on

---

[11] *Aschenbrenner* v. *United States Fidelity & Guaranty Co., supra* note 10, at 84–85.

[12] This is not, of course, to deny that the statute and regulations adopted pursuant to it give rise to an obligation that has the force of a binding contract with the serviceman insured. See *Lynch* v. *United States,* 292 U. S. 571, 579 (1934).

[13] § 608, 38 U. S. C. § 808, quoted in part *supra,* note 6.

insurance matters,[14] amended the last sentence of § 608 to add the words set out in italics:

> "Except in the event of suit as provided in section 617 hereof, *or other appropriate court proceedings,* all decisions rendered by the Administrator under the provisions of this Act, or regulations *properly* issued pursuant thereto, shall be final and conclusive on all questions of law or fact, and no other official of the United States, *except a judge or judges of United States courts,* shall have jurisdiction to review any such decisions."

The extension of procedures available to secure judicial review, the interpolation of the word "properly," and the addition, presumably out of an abundance of caution, of the tautological phrase "except a judge or judges of United States courts" are indicative of congressional concern that the regulations of the Veterans' Administration be subject to more than casual judicial scrutiny when they are based upon a controverted construction of the statute.

Accordingly, § 602 (h) (2) must be read in the full context of related sections of the statute and other indicia of legislative intent before we can adequately determine whether the regulation is "not inconsistent" with the provisions of the Act and whether it is "necessary or appropriate to carry out its purposes." We turn therefore from narrow, semantic considerations to a broader context in which the intent of Congress can be more readily comprehended.

The proper meaning of § 602 (h) (2) becomes apparent when the respective assumptions and consequences of each of the two alternative interpretations before us are tested against the legislative history and the statute viewed in its entirety. The construction adopted by the Circuit

---

[14] S. Rep. No. 1705, 79th Cong., 2d Sess. 9; H. R. Rep. No. 2002, 79th Cong., 2d Sess. 10; § 12 of the 1946 amendment, 60 Stat. 781, 788, amending § 608.

Court of Appeals would result in conferring a far greater return to beneficiaries in the group covered by § 602 (h) (2), *i. e.*, over thirty at the time of the insured's death, than the return to which first beneficiaries covered by § 602 (h) (1), *i. e.*, under thirty at the insured's death, are entitled. It is unquestioned that the latter group, under the original statutory provisions,[15] were entitled only to 240 monthly installments (*i. e.*, over a 20-year period) which in the aggregate equal the face value plus interest, with no further installments payable thereafter, whether or not the payee survived that limited period. But, under the ruling of the Circuit Court of Appeals, payments in many if not most of the cases involving the former group of beneficiaries would exceed the face value of the policy since any first beneficiary who survived the 10-year period of § 602 (h) (2) would automatically secure more than that amount. In fact, the actual value of a policy, at maturity, to a 30-year old beneficiary, under this ruling, would be almost two and a half times its face amount,[16] whereas the 29-year old beneficiary, paid in accordance with § 602 (h) (1) (whose interpretation is not open to question), could never receive more than the face amount, plus interest. And the aggregate of guaranteed and continuing payments made at so high a rate under § 602 (h) (2) would necessarily greatly exceed the total face value of the policies issued under the statute.[17]

---

[15] The statute was amended in 1946 to make all future beneficiaries, regardless of age, eligible for the life annuity with 120 guaranteed payments previously limited to those over thirty. § 9 of the 1946 amendment, 60 Stat. 781, 785, adding subsection (t) (3) to § 602 of the 1940 Act.

[16] See table, *infra* note 18.

[17] *Ibid.*

As mentioned in note 15 *supra,* the life annuity with 120 guaranteed payments was made available in 1946 to all beneficiaries regardless of age. Acceptance of respondent's interpretation would require us to view Congress as having offered, in the 1946 amendment, four

This sharp disparity between the two different groups of beneficiaries does not result under the regulation, since

optional settlements (see note 36 *infra*), three of which would be limited in value at maturity to the face amount of the insurance, while the fourth option would offer a value far in excess of the face amount and would be available to all beneficiaries without regard to their age at the insured's death.

By the calculations of the American Experience Table, a person has to be 68 years old before his life expectancy is less than 10 years. Accordingly, in all cases where the first beneficiary is under 68 years of age at the time the insured dies, the actual value of the policy, thus computed, would exceed its face amount. The Administrator estimates that, on the approximately 2.1 billion dollars of death claims already incurred and now being settled under the provision for life income with installments guaranteed for 120 months, the additional liability that would result if settlement were required to be made pursuant to the Circuit Court's holding would amount to approximately 1.8 billion dollars. Government's brief, p. 67. Potential liability on the billions of dollars of insurance now in force and yet to mature would similarly be vastly increased under this view.

The precise size of the latter liability is of course problematical. In a letter to the Solicitor General, dated October 24, 1947, the Veterans' Administration estimated the amount of insurance in force and not yet matured at 35 billion dollars. Assuming that all of that insurance would be held to mature at death and that the typical beneficiary would be a woman aged 30 at the death of her husband, and that all policies would be settled under the life income option with installments guaranteed for 120 months, the Administrator estimated that potential liability under respondent's view of the statute might be about 97 billion dollars, instead of 35 billion dollars (the potential liability under Regulation 3450)—an increased future liability of 62 billion dollars. And if 10% of all lapsed policies were reinstated, the potential additional liability (on the basis of the above assumptions) would be about 19.7 billion dollars.

While these assumptions may be overly favorable to the Government's contentions and may not be fully borne out by the course of future events, it is obvious—even allowing for a wide margin of error—that the added potential liability under the holding of the Circuit Court of Appeals might well amount to billions of dollars.

the age of the first beneficiary is used by the regulation as the basis of an actuarial calculation pursuant to a formula whereby total payments under § 602 (h) (2) approximate the face value of the policies, plus interest. The extent of the difference in result is indicated by the table, set forth in the margin,[18] of comparative present values of the monthly installments under the regulation and under the view of the Circuit Court of Appeals, taking into account the beneficiary's life expectancy as shown by the American Experience Table of Mortality.

The Circuit Court thought it probable that Congress originally intended the higher rate of benefit payments to be restricted to the beneficiaries covered by § 602 (h) (2) because that group of persons over 30 at the time of the serviceman's death would include parents, who would be at least middle-aged, and "young widows with small children whose ten years of monthly payments would end at the most needed time." [19] This would hardly serve to explain, however, why Congress would intentionally discriminate in so substantial a manner against a similarly deserving but slightly younger widow in the under-thirty category by failing to extend comparable benefits to the latter group.

---

| [18] Beneficiary's age | Present value under Regulation 3450 | Present value under C. C. A. 7 view |
|---|---|---|
| 10 | $1,000 | $2,786 |
| 20 | 1,000 | 2,633 |
| 30 | 1,000 | 2,421 |
| 40 | 1,000 | 2,136 |
| 50 | 1,000 | 1,783 |
| 54 | 1,000 | 1,629 |
| 60 | 1,000 | 1,411 |
| 70 | 1,000 | 1,129 |

See Appendix D of the Government's brief for the mathematical formulae used in constructing this table.

[19] Transcript of Record, p. 10.

The disparity in benefits available under the respondent's view, as contrasted with those available under the regulation, is reflected in a correspondingly large increase, under the former view, in the total liability for beneficial payments.[20] This greatly enhanced liability could be met, theoretically, in either of two ways: by special congressional appropriations, or by greatly increased premium rates substantially above those which are now set by the Veterans' Administration on the assumption that the regulation is proper.

The Circuit Court of Appeals was of the opinion that Congress intended the Government to bear the burden of this extraordinary liability. By express provisions in the 1940 Act, Congress specified that the United States would bear the administrative costs of the insurance system,[21] excess mortality and disability cost resulting from the extra hazards of war,[22] and the cost of reimbursing the reserve fund for waiving recovery of benefit payments erroneously made where it would be inequitable to require repayment.[23] Congress obviously contemplated that the reserve fund to meet the liabilities of National Service Life Insurance policies was to be self-supporting, sustained by the premiums paid and by the yield of premiums invested, in all respects aside from those exceptional situations where the statute specifically designated that the Government would bear the financial burden. Yet Con-

---

[20] Under the respondent's view, this extraordinary putative liability must be considered to have been tremendously increased by the extension of the § 602 (h) (2) method of payment to all beneficiaries by the 1946 amendment which removed the limiting age factor. See note 15 *supra*.

[21] § 606, 38 U. S. C. § 806.

[22] § 607 (a), 38 U. S. C. § 807 (a).

[23] § 609, 38 U. S. C. § 809. Subsequent amendments to the 1940 Act added other specified costs to be borne by the United States. See, *e. g.*, 38 U. S. C. (Supp. V, 1946) § 802 *et seq.*

gress nowhere specified that the United States would bear the huge cost of the enhanced liability that it would necessarily have anticipated had it impressed upon § 602 (h) (2) the meaning that respondent finds there; and that striking omission is persuasive, in the absence of cogent considerations to the contrary, that no generosity of this magnitude was contemplated.[24]

Nor can it be assumed that Congress envisaged the setting of premium rates high enough to meet an added liability of such proportions. Senator Harrison, who was in charge of the original bill, informed the Senate that "Premium rates based on the average age—25 years—will be 67 cents per thousand per month." [25] Such a rate, though adequate to cover payments under Regulation 3450, would be completely inadequate under the respondent's construction.

Moreover, whatever ambiguity exists in the language of § 602 (h) (2) is dispelled by a consideration of the practice in effect under United States Government Life Insurance, established for World War I veterans, and the long-established practice of commercial insurance companies, viewed as part of the background of experience which the draftsmen of § 602 (h) (2) may be assumed to have had in mind.

The World War Veterans Act, 1924,[26] provided for payment of insurance benefits in 240 equal monthly installments, but authorized the Veterans' Administration (formerly the Veterans' Bureau) to provide in the contract

---

[24] *Cf.* the reasoning of the Court, speaking through Mr. Justice Holmes, in *Pine Hill Coal Co.* v. *United States,* 259 U. S. 191, 196 (1922): "A liability in any case is not to be imposed upon a government without clear words. . . . and where, as here, the liability would mount to great sums, only the plainest language could warrant a court in taking it to be imposed. . . ."

[25] 86 Cong. Rec. 12920 (1940).

[26] Title III, 43 Stat. 607, 624, as amended, 38 U. S. C. § 512.

of insurance "for optional settlements, to be selected by the insured, whereby such insurance may be made payable either in one sum or in installments for thirty-six months or more. . . ." One of the options, set up by Regulation 3068 under this statutory authorization, provided that monthly installments in amounts designated in an appended table—the amounts being graduated, just as in Regulation 3450, with the "age of beneficiary at time of death of the insured"—"will be payable throughout the lifetime of the designated beneficiary, but if such designated beneficiary dies before 240 such installments have been paid, the remaining unpaid monthly installments will be payable in accordance with the beneficiary provisions of the policy." [27]

It seems apparent to us that the congressional draftsmen, in framing § 602 (h) (2), were undoubtedly striving to incorporate into the 1940 Act a provision modeled on the life-annuity-with-240-payments-certain option set up by Regulation 3068 under the World War Veterans Act of 1924, deviating materially only in the number of payments guaranteed. True, § 602 (h) (2) does not itself define expressly the method of computation to be used by the Administrator in determining the size of the monthly installments in any given case. But, taking into account the factors previously set forth and considering them against the background of experience under the 1924 Act, the only reasonable conclusion is that Congress intended the calculation to be an actuarial one, based on the age of the beneficiary. To subscribe to the opposite conclusion, we must believe that Congress intended, by its wording of § 602 (h) (2), to bestow upon beneficiaries of World War II servicemen total payments completely disproportionate to those available to beneficiaries of World War I servicemen. To believe that

---

[27] 38 C. F. R. 10.3068.

Congress, by the enactment of a somewhat ambiguous provision, intended this disproportionate result along with the other disparities that have been shown to be required by the respondent's view, puts too great a strain upon the imagination.

Moreover, the congressional draftsmen of § 602 (h) (2), with the example before them of the 1924 Act and the similar practice of standard commercial insurance companies, undoubtedly considered that even the very wording of that subsection, without more, necessarily implied that the Administrator was to follow the existing practice in calculating the size of the monthly installments. As previously noted, the term "certain" appearing in the phrase "equal monthly installments for one hundred and twenty months certain" is a technical word that connotes, because of the context in which it is commonly used in standard commercial policies, an actuarial calculation of the monthly installments payable.

For example, one of the standard life insurance policies used in 1940 provided for a life income option to be "Made payable in equal annual, semi-annual, quarterly or monthly instalments for ten or twenty years certain, with payments continuing during the remaining lifetime of the person upon whose life the income depends . . . . The first instalment will be due upon the date on which the option becomes operative. The amount of such instalments shall be determined in accordance with the table of instalments on the following page, which instalments include interest at the rate of 3% per annum, and shall be based on the sex and the age at birthday nearest the due date of the first instalment, of the person upon whose life the income depends. . . ." [28] Another example, closer to the concise form of § 602 (h) (2),

---

[28] *The Handy Guide to Standard and Special Contracts* (1940) 294.

though using the term "fixed" rather than "certain," is
an option which provides for "the payment of equal
monthly instalments in accordance with the table below
[a table whose payments are graduated in amount with
respect to the "Age of Payee Nearest Birthday at Date
of First Instalment"], to the insured or the beneficiary,
as the case may be, for a fixed period of ten years and
for so long thereafter as the payee shall survive, the first
instalment being payable immediately." [29]

Congress may also have assumed that its intent was
made manifest by the juxtaposition of § 602 (h) (2) with
other provisions having similar connotations. Section
605 (b), for example, authorizes the Administrator "to
set aside out of [the National Service Life Insurance
Fund] such reserve amounts *as may be required under
accepted actuarial principles, to meet all liabilities* under
such insurance . . . ." (Italics added.) And § 602 (e)
provides that the premium rates, all "cash, loan, paid
up, and extended values, *and all other calculations in
connection with such insurance, shall be based upon said
American Experience Table of Mortality* and interest at
the rate of 3 per centum per annum." (Italics added.)

In any event, the subsequent legislative history of the

---

[29] *Id.* at 613.

A third illustration provides in the following terms for an election
between a plan similar to that provided by § 602 (h) (2) as con-
strued by Regulation 3450, and the refund life income plan provided
by the 1944 amendment to the statute (see note 33 *infra*): "The com-
pany will pay equal monthly instalments during the payee's remaining
life, with 120 or 240 instalments certain or with instalments certain
until the proceeds are refunded, as may be designated in the election
of the option, the amount of each instalment to be determined from
the table entitled 'Option 4—Life Income With Instalments Certain'
in accordance with the sex of the payee and the age of the payee at
the payee's birthday nearest to the date when the proceeds of this
policy shall become payable, the first of said instalments to be
payable immediately. . . ." *Handy Guide, supra* note 28, at 983.
See also *id.* at 1284–85.

statute clearly indicates congressional approval of the construction put upon § 602 (h) (2) by Regulation 3450. A proposed bill was suggested in a letter written by the Administrator of the Veterans' Administration to Congress in June, 1944, to amend §§ 602 (h) (1) and 602 (h) (2) of the 1940 Act by authorizing "the election of a refund life income in lieu of the mode of payments now provided." [30] In explaining the necessity of the amendment, the Administrator pointed out that if "a widow having a minor child, who is entitled to payments as provided in section 602 (h) (2), dies after having received one or more installments of insurance, payments under the contract will cease after payment of 120 installments has been completed *even though the total amount of the installments paid or payable is less than the face value of the policy* and even though the child is too young to be capable of self-support at the time payments expire. The proposed amendments will authorize the payment of the full face value of the insurance *in every instance* and will also insure an income throughout the lifetime of the first beneficiary under the policy." [31]

In other words, the amendment was proposed partly to extend a life income option to beneficiaries covered by § 602 (h) (1), who theretofore had been eligible only for the 240-payment plan, and partly to provide a solution for the inequitable situation presented in certain cases covered by the provisions of § 602 (h) (2), when the 120 installments certain amounted to less than the face value of the policy and the first beneficiary died before having received an amount equal to that face value. The inequitable situation thus considered to be present under § 602 (h) (2) and sought to be ameliorated by the proposed amendment could not have existed, of course,

---

[30] S. Rep. No. 1105, 78th Cong., 2d Sess. 2, quoting the Administrator's letter.

[31] *Id.* (italics added).

if the Circuit Court of Appeals were correct in the construction it has put upon § 602 (h) (2).

The Senate Committee on Finance, in recommending passage of the bill, adopted the Administrator's letter as explanatory of the various provisions of the bill [32] and indicated thereby its approval of the interpretation embodied in Regulation 3450, since otherwise a major purpose claimed to be effected by the amendment would have been completely illusory. Moreover, a table included in the Administrator's letter, comparing the amount of each monthly installment and the sum of the guaranteed installments under the new refund life income plan and under § 602 (h) (2), clearly apprised Congress of the construction put upon the latter section by the regulation. Hence, in enacting the amendment [33] Congress indicated its approval of the interpretation upon which the Regulation is based.[34]

Similar recognition that in many instances "the aggregate amount of insurance actually payable" under the original mode of settlement provided by § 602 (h) (2)

---

[32] *Id.* at 1.

[33] Section 6 of the 1944 Act, 58 Stat. 762, 763, amended § 602 (h) (2) by providing that the Administrator "may include a provision in the insurance contract authorizing the insured or the beneficiary to elect, in lieu of this mode of payment, a refund life income in monthly installments payable for such period certain as may be required in order that the sum of the installments certain, including a last installment of such reduced amount as may be necessary, shall equal the face value of the contract less any indebtedness with such payments continuing throughout the lifetime of such beneficiary: *Provided further,* That such optional settlement shall not be available in any case in which such settlement would result in payments of installments over a shorter period than one hundred and twenty months, nor in any case in which payments of insurance installments have been commenced prior to the date of this amendatory Act." Section 5 of the 1944 Act added a similar amendment to § 602 (h) (1).

[34] Cf. *Alexander* v. *Mayor,* 5 Cranch 1, 7–8 (1809).

"amounted to much less than the face of the policy" was given by the House Committee on World War Veterans' Legislation, in recommending a 1946 amendment to permit policies on which payments had been made prior to the 1944 act to elect the refund life income plan.[35] The 1946 bill also included a provision setting up optional modes of settlement for insurance maturing on or after August 1, 1946, and the third option was couched in language identical in every significant respect to that used in the original § 602 (h) (2).[36] Accordingly, when Congress enacted the 1946 bill, it in effect incorporated the old provision of § 602 (h) (2), which was the basis for Regulation 3450, and in our view thereby accepted the construction embodied in that regulation, which had been so clearly brought to its attention on this and prior occasions.

[35] H. R. Rep. No. 2002, 79th Cong., 2d Sess. 5. The measure was approved by Congress, and § 5 (a) of the Act amends § 602 (h) (1) and (2) as indicated. 60 Stat. 781, 782–3.

[36] Section 9 of the Act added to § 602 a new subsection (t), reading as follows: "Insurance maturing on or subsequent to the date of enactment of the Insurance Act of 1946 shall be payable in accordance with the following optional modes of settlement:

"(1) In one sum.

"(2) In equal monthly installments of from thirty-six to two hundred and forty in number, in multiples of twelve.

"(3) In equal monthly installments for one hundred and twenty months certain with such payments continuing during the remaining lifetime of the first beneficiary.

"(4) As a refund life income in monthly installments payable for such period certain as may be required in order that the sum of the installments certain, including a last installment of such reduced amount as may be necessary, shall equal the face value of the contract, less any indebtedness, with such payments continuing throughout the lifetime of the first beneficiary: *Provided*, That such optional settlement shall not be available in any case in which such settlement would result in payments of installments over a shorter period than one hundred and twenty months. . . ."

Further evidence, were any needed, that Congress accepted as its own this interpretation of the language used in § 602 (h) (2) is supplied by the significant distinction maintained in this reenactment between the mode of payment originally provided by § 602 (h) (2) and the refund life income plan, viewed in the light of the House Committee Report on the bill. It is hardly conceivable—and if conceivable, hardly explicable—that Congress meant one thing by the language it used in § 602 (h) (2) when enacting the original measure in 1940, and another, quite different thing, when it reenacted that language in 1946.

In the light of the foregoing considerations, the validity of Regulation 3450 is sustained and the decision of the Circuit Court of Appeals is

*Reversed.*