**UNITED STATES of America,**
**Appellant,**

v.

**Edith VANDVER, Appellee.**

**No. 12530.**

United States Court of Appeals
Sixth Circuit.

March 20, 1956.

Richard M. Markus, Washington, D. C., Warren E. Burger, Melvin Richter, Washington, D. C., J. Leonard Walker, Louisville, Ky., on brief, for appellant.

David G. Cates, Louisville, Ky., for appellee.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Service Life Insurance policy upon the life of the insured, Jewell Burns, lapsed on January 23, 1946, by reason of failure to pay the premium due on December 23, 1945. The insured made no application for waiver of the payment of premiums. He died on January 26, 1948. His mother, the beneficiary under the policy, made application for waiver of premiums on March 3, 1948, in accordance with the governing statute, and upon denial thereof, filed this action to recover on the policy. The district court found in her favor and entered judgment in the amount of the policy, from which the government appeals.

The sole question involved is whether the insured's failure to make timely application (on or before August 1, 1947) for waiver of premiums "was due to circumstances beyond his control," under which conditions the failure is excused by Section 802(n), Title 38 U.S.C.A.

The following are the facts in the case: On December 8, 1944, a little more than a month before he was eighteen years old, Jewell Burns, a boy from Kentucky, was inducted into the armed forces of the United States. Six months later, at Pearl Harbor, he be-

came ill, and it was discovered by X-rays that he had cancer. He was thereafter sent to the Naval Hospital at Oakland, California, where, immediately after his admission, an emergency surgical operation was performed upon him and a cancerous tumor removed from the left lower portion of his chest. In the operation, several of his ribs were removed, leaving an instability, or loss of support, over a large area of his chest wall. According to the undisputed expert medical evidence, there is, as a result of such an operation, and because of damage to the nerves, frequently severe pain in the chest wall which may continue for two years or so. The evidence discloses that the section of his side showing the removal of the ribs was about two and a half feet long down his left side; and the boy suffered pain from the time of the operation until he died of the same cancerous condition a year and a half afterward.

Before his induction into the armed forces, the boy enjoyed perfect health, never having had any injury or illness. A couple of months after the operation, he received a discharge from the armed forces because of total disability as a result of the operation; and he came back home to Kentucky. During the time that he was at home, totally disabled, according to the testimony of his mother, "he laid around the house all the time, he didn't have any energy to do anything." He never engaged in any physical exercise; "he complained with his side all the time and he would get up * * * two or three times a night, a lot of times, and I would rub him in alcohol, but it didn't do him any good." His side was "kind of caved in * * * and there was a knot up there" the size of a hen's egg. He had a scar, "eighteen or twenty stitches across his back, down around his side." After he was discharged from the hospital, until the time of his death, he was continuously ill. As his mother said, "I don't think he ever drew a well day." The boy's stepfather testified that when he returned from the hospital, "he felt mighty bad. He didn't go anywhere

hardly * * * complained all the time. * * * he had a knot on his side * * * [He] complained of it hurting," and said that he believed it was getting bigger all the time. When his parents asked him to go out with them, he said no, "he didn't go anywhere, just lay around the house. A lot of times he wouldn't eat no breakfast at all. * * * he acted like he was in a deep study a lot of times, about something all the time. He wouldn't tell us any of his troubles. We hated to bother him because we felt like he was depressed and we didn't want to worry him. * * * He didn't seem like he taken any interest in anything." He went once in a while to the center of the town, never alone, but always with someone else. He never went outside the city in the year and a half that he was home before he died except to go to Lexington when the doctors of the Veterans Administration required him to do so for an examination.

When he left the hospital and received a medical discharge for total disability, the government paid him disability benefits on the basis of 100% disability. This fact does not appear in the stipulation or evidence, but from the arguments of counsel and the findings of the court, we assume that such benefit payments were made. It does not, however, appear from the record that the boy knew he was totally disabled at the time, or that he was receiving disability payments on the basis of 100% disability.

On August 1, 1947, the boy was called up again for another physical examination by doctors of the Veterans Administration. As a result of this examination, his classification of 100% disability was reduced to 30% disability. The admitted fact is that when the boy was operated upon in Oakland, California, and the cancerous tumor was removed, his trouble was diagnosed as Ewing's sarcoma. This is one of the most malignant and insidious types of cancer. It is rarely cured, and is notorious for its ability to spread to other parts of the body. The undisputed medical evidence of Dr. Drye, on the trial, is that he did not be-

lieve there was any authenticated case of Ewing's sarcoma, arising in the chest wall, that had ever been cured, and that it was evident that the boy died of Ewing's sarcoma which, at the time of the operation, either had already spread, or had not been entirely removed. The evidence disclosed that between the date of the boy's discharge from the Navy and the date of his death, he showed the various symptoms of the spread of the malignancy through his body, by his lassitude, fatigue, general malaise, and anemia. When he died on January 26, 1948, Jewell Burns was twenty-one years and fifteen days of age.

■ If the insured in this case did not know what his condition was, and that it was one of total disability, his failure to apply for waiver of premiums does not, as a matter of law, bar his mother, as beneficiary, from the right of applying for such a waiver and having such application allowed. For the beneficiary would have such right on the ground that the insured's failure to apply for such a waiver was due to circumstances beyond his control.

It is plain that the insured did not know that he was suffering from one of the most malignant and incurable cancers known, neither at the time of his operation, at the time of his medical examination on August 1, 1947, and up to his death, nor at any time during his entire illness. The proof of the foregoing is that the doctors themselves, upon their examination of the boy on August 1, 1947, concluded that he was only 30% disabled, although he was in the last stages of Ewing's sarcoma and had only five months to live. If the doctors did not know what his condition was, and what his disability was—if they thought he was cured when he was just about to die, it is evident that the boy did not know that he was totally disabled and dying of a rapidly spreading and incurable cancer. For he was relying completely upon the doctors of the Veterans Administration for advice and information about his condition and treatment of his illness. On these admitted facts,

the failure of the insured to apply for waiver of premiums sustained the holding of the district court that such failure resulted from circumstances beyond his control in that he was mentally incapable of knowing or realizing his condition. For it was impossible for the insured to know that he was afflicted with this deadly, incurable disease when the medical authorities of the Veterans Administration were ignorant of that fact during the period from the time of his discharge from the armed forces to the date of his death; and he could not have known that he was totally disabled on August 1, 1947, when his physical examination took place, and when the doctor in charge found that he had only 30% disability. It is true that the insured was not rated as 30% disabled until August 20, 1947; but such rating required the signature of two specialists on claims and occupation, who were not physicians. The medical examination was made on August 1, 1947. The physician of the Veterans Administration at that time found considerable improvement in the condition of the insured and concluded that he was only 30% disabled. On that day, the insured could still have filed application for waiver of premiums if he had been totally disabled. But he could not have known that he was totally disabled on that day, in view of the conclusion of the only physician on whom he relied, that he was only 30% disabled. Yet he was on the brink of death and was, in fact, totally disabled on August 1, 1947.

■ Lack of knowledge of the existence of disease or of its seriousness and effect, and lack of knowledge of total disability arising in the life of the policy may, as a matter of fact, be found to be due to circumstances beyond the control of the insured, and, hence, excuse the failure to make timely application for waiver. Under such circumstances, the beneficiary may apply for the waiver. Landsman v. United States, 92 U.S.App. D.C. 276, 205 F.2d 18; United States v. Myers, 8 Cir., 213 F.2d 223. "Ignorance of the existence or seriousness of an in-

jury or disease may in a proper case constitute such a circumstance [beyond his control]—if the ignorance is in fact beyond control." Landsman v. United States, supra, 205 F.2d at page 22.

The government points out that the insured, after the Veterans Administration reduced his benefit payments from a basis of 100% disability to 30% disability, found a job with the company where he had been employed before the war and worked there more than four weeks, resigning because of his pain and illness a few months before his death. This, it is suggested, shows that he was not, in fact, totally disabled, and that his failure to apply for waiver was not a circumstance beyond his control. The story of the boy's attempt to work the last few months of his life because of the action of the Veterans Administration is, indeed, a sad final chapter in his story that ended, after so much suffering, as he reached his twenty-first birthday. When his payments were cut to a basis of 30% disability, he did not have enough money for his needs. He went back to the place where he had worked before the war. His employer apparently did everything for him and made every concession. Sometimes the boy did not arrive at work until eleven o'clock in the morning and left at one o'clock in the afternoon because of his pain. On one occasion, his employer had his chest taped up to help him in his distress; but when he came home that day, the cancer was paining him so much that his mother put him in the bathtub to soak the tape off. He held on to the job as long as he could. But it was hopeless to continue, and he was soon to die.

■ The fact that the insured received payments from the government on the basis of 100% disability up to August 1, 1947, is not controlling, in the light of the circumstances heretofore mentioned, nor was the fact that the insured tried to have the full payments restored after they had been reduced under the completely mistaken assumption of the Veterans Administration that the boy was recovering from his illness when he was worse off than he had ever been before. He was interested in getting some money for his needs, rather than because of concern with the disability classification. As to his discharge from the service because of 100% disability, while the discharge appears in the record, the grounds of discharge do not appear.

There is no claim made that the insured was mentally incompetent; but it has, as yet, not been held that continual pain from cancer, fatigue, lassitude, anemic loss of energy, depression, and withdrawal from the simplest activities of family and friends resulting from such a malignant and fatal illness may not, taken together with evidence that the veteran was ignorant of his true condition, sustain the finding of a court that the failure of a veteran, so afflicted, to ask for a waiver of premiums, was due to circumstances beyond his control, even where the veteran has been capable of answering the order of the doctors of the Veterans Administration to appear for physical examination, and where, in spite of incessant pain and complete exhaustion, he has tried unsuccessfully to work.

■ The humanitarian purpose of the statute here controlling points to a liberal interpretation in aid of the veteran. United States v. Zazove, 334 U.S. 602, 68 S.Ct. 1284, 92 L.Ed. 1601; Thomas v. United States, 6 Cir., 189 F.2d 494; Landsman v. United States, 92 U.S.App. D.C. 276, 205 F.2d 18.

■ Here, the district court held that the failure of the assured to make application for waiver of premiums on account of disability resulted from circumstances beyond his control in that he was mentally incapable of knowing or realizing his condition. If it were considered that there was any ambiguity as to the meaning of the phrase, "circumstances beyond his control," as used in the statute, it would be construed liberally to effectuate the beneficent purposes that Congress had in mind. United States v. Zazove, supra, 334 U.S. at page 610, 68 S.Ct. 1284. As we have hereto-

fore said, the evidence sustained the trial court's holding that the insured's failure to make timely application for waiver of premiums was due to circumstances beyond his control, for the insured could not have known that he was afflicted with a deadly, incurable cancer when the physicians were ignorant of that fact, and he could not have known that he was totally disabled on August 1, 1947, when, at that time, the doctor on whom he solely relied found that he had only 30% disability.

Moreover, regardless of whether the veteran knows that he has a classification of total disability, if he does not know that he has an incurable disease which is to bring about his death in a short time, his lack of knowledge of his true condition, induced by either the encouragement or ignorance of the doctors of the Veterans Administration, is "a circumstance beyond his control" that excuses his failure to apply for waiver of premiums. In Kershner v. United States, 9 Cir., 215 F.2d 737, 739, a veteran was discharged from the Navy in March, 1946. Premiums on his policy were paid to April, 1946. But the month before, he had become totally disabled so that it was impossible from that time forward for him to follow continuously any substantial gainful occupation up to the time of his death three years and seven months later. During this entire time subsequent to the last payment of premiums in April, 1946, to November 16, 1949, the date of his death, the veteran was in and out of various hospitals of the Veterans Administration in different parts of the country. He was suffering from chronic myelogenous leukemia, from which he eventually died, and the government doctors at all times after his discharge considered his case almost hopeless but chose to encourage him in believing that there was real hope for his recovery. After six months of his continuous disability, he could have obtained a waiver of all premiums on his policy by the simple act of applying for it. In reversing the district court which had held that his beneficiary could not

apply for waiver, and denied recovery, Judge Chambers, speaking for the Court of Appeals, said that the underlying intention of Congress, when it used the words, "circumstances beyond his control," must have been to cover cases "where the veteran was deprived of a chance, disability existing, to make a free or intelligent choice of whether or not he wanted his insurance to continue. * * * The clause 'circumstances beyond his control' seems to have the purpose of preventing plain injustices—to give relief where one as a rule may assume that the veteran was hampered in making a choice or prevented from doing so." The court went on to say that if the veteran had fully known of his condition and almost certain death within a short time, and was mentally competent, the court would be obliged to hold that, with this knowledge, his failure to apply for a waiver of premiums within the time provided would not be excused. However, the court declared:

"If, absent a showing that a serviceman positively did not want insurance, it will be presumed that he did want it (and this seems to be one of the practical effects of Section 802(n) ), it seems quite as reasonable to hold that this veteran Kershner had circumstances beyond his control and was therefore entitled to have his beneficiary, his mother, apply for the premium waiver, thereby insuring collection of the policy by her.

"The element present here, lack of knowledge of true condition, induced by the affirmative humane acts of Veterans' Administration doctors, we think is quite as much a circumstance beyond the decedent's control as if he had been insane."

In United States v. Cooper, 6 Cir., 200 F.2d 954, relied upon by appellant, there was no evidence that the insured was ignorant of his true condition and that his failure to apply for waiver was, therefore, a circumstance beyond his control.

■ We are of the opinion that the findings of fact of the district court were sustained by the evidence above set forth; and no error appearing, the judgment is, accordingly, affirmed.

MILLER, Circuit Judge (dissenting).

It may well be that the judgment herein reviewed should eventually be affirmed. But, in my opinion, the record in its present shape does not furnish a satisfactory basis for doing so, and the case should be remanded for amplified or additional findings of fact.

The majority opinion well portrays the strong humanitarian appeal present in this case. The review of the evidence therein does not, however, reject or contradict the basic fundamental fact that on January 26, 1948, when the insured died, the policy herein sued on was not in force or effect, having lapsed, for nonpayment of premiums, on January 23, 1946, approximately two years prior thereto. During that time no application was made for waiver of premiums.

This Court has held in two recent decisions that 100% physical disability *in and of itself* is not sufficient to constitute "circumstances beyond his control" which under the statute would excuse the insured's failure to apply for waiver of premiums. United States v. Cooper, 6 Cir., 200 F.2d 954; Gossage v. United States, 6 Cir., 229 F.2d 166. See also: McIntosh v. United States, D.C.E.D.Ky., 114 F.Supp. 241. The facts in the present case are in many respects analogous to the facts in those cases. The insured, although totally physically disabled, was not confined to his home. He made occasional trips to the center of town. I do not read the evidence as saying that he did not at any time go alone. On one occasion he made a trip by himself from his home in Louisville, Kentucky, to Lexington, Kentucky, and return. He received letters from the Veterans Administration and transacted necessary business with the Administration. It was stipulated by the parties that from October 1, 1947 to November 5, 1947 he was employed by the American Radiator and Standard Sanitary Corporation at Louisville, Kentucky, "during which period of time he worked 40 hours per week, resigning because of illness."

In both the Cooper and Gossage cases, as well as in this case, there was 100% physical disability. In the Cooper case the insured had a severe heart lesion. The insured died from coronary thrombosis due to hypertension and arteriosclerosis. In the Gossage case, the insured was constantly under the care of physicians and spent considerable time in several different hospitals. He had a skin ailment known as "jungle rot"; his voice was constantly hoarse and he was short of breath. He often had fever, and it was also thought that he had a goiter. His trouble was later diagnosed as chest cancer, with death inevitable, which fact he knew several weeks before his death. In each of those cases this Court held that the failure of the insured to apply for waiver of premiums was not due to circumstances beyond his control. Unless the present case involves some additional material fact, it is necessarily controlled by our previous decisions in the Cooper and Gossage cases, although it is recognized that the cases cited in the majority opinion may have established a contrary rule in some of the other circuits. The rule in those circuits, however, is also in conflict with the rulings in Aylor v. United States, 5 Cir., 194 F.2d 968, and Horton v. United States, 5 Cir., 207 F.2d 91, certiorari denied 346 U.S. 903, 74 S.Ct. 233, 98 L.Ed. 403. See also Novak v. United States, D.C.W.D.Pa., 107 F.Supp. 151.

The additional fact upon which the ruling of the District Judge is based is contained in his finding that the insured "was mentally incapable of knowing or realizing his condition." This is the Court's finding from a consideration of the evidence reviewed in the majority opinion. The review of the evidence in the majority opinion, together with any conclusions there drawn by the Court, can not be used on this appeal as findings, since findings are to be made by the trial court, not by this Court on re-

view. Paramount Pest Control Service v. Brewer, 9 Cir., 170 F.2d 553; Campbell v. Campbell, 83 U.S.App.D.C. 237, 170 F.2d 809, 810. I am of the opinion that, in view of other factors hereinafter referred to, the finding of the District Judge is not definite enough to advise us of the exact factual situation presented and to afford us a satisfactory basis for a review.

If the finding is to be construed as meaning that the insured was mentally incompetent, it would furnish the necessary factual basis for the Court's ruling. But such a finding would be contrary to Paragraph 11 of the Stipulation between the parties that "at no time subsequent to the insured's discharge from the United States Navy on September 26, 1945 was the insured mentally incompetent," and would have to be set aside. If it be construed as meaning a certain limited mental disability, there is a serious question if such a finding is not also in conflict with the Stipulation.

If the finding be construed as meaning that the insured, although mentally competent, did not know that "his condition" was one of total disability, it, together with other facts, might bring the case within the rule stated in Landsman v. United States, 92 U.S.App.D.C. 276, 205 F.2d 18. As pointed out in Gossage v. United States, supra, the rule to be applied in such a situation is still an open question in this Circuit. But such a finding would present a serious question as to whether it was clearly erroneous in view of another finding of the District Judge that on September 26, 1945 the veteran received an honorable medical discharge because of total physical disability and drew disability benefits for one hundred percent disability until some time in August 1947 when his rate of disability was cut to 30%. There is also the uncontradicted evidence that when he was notified by the Veterans Administration on August 20, 1947 of the reduction, he attempted to have the 100% rating restored. Although the insured may not have known the exact cause of his trouble, I find no evidence directly supporting a finding that the insured did not know of his 100% disability rating.

If the finding be construed as meaning that the insured, although knowing that he was rated 100% disability, did not know or realize that "his condition" was Ewing's Sarcoma, a most malignant cancer-type growth, or that his disease was incurable, a question of law is presented which is not covered by the previous ruling of this Court or by the ruling in Landsman v. United States, supra. The majority opinion apparently relies in part upon the assumed fact that the physicians who examined the insured were ignorant of the fact that he had Ewing's Sarcoma. There is no finding to that effect. On the contrary, Paragraph 8 of the Stipulation between the parties reads as follows: "The insured was given an honorable discharge from the United States Navy on September 26, 1945, after having received treatment at the Navy Hospital, Yosemite, California, on August 9, 1945, wherein his illness was diagnosed as 'Sarcoma, Ewing's, Ninth Left Rib;' this condition having been first discovered by X-ray at Pearl Harbor on June 15, 1945, the operation having taken place at Oakland, California, on July 7, 1945, wherein the anterior portion of the ninth rib was removed with borders of the adjacent rib and a tumor mass." I also think reliance is erroneously placed upon the ruling of the Veterans Administration which changed the insured's disability rating from 100% to 30%. This occurred on August 20, 1947, which was subsequent to the time (August 1, 1947) when any application for waiver of premiums was barred by the statute. Obviously, his failure to apply for the waiver by August 1, 1947 was not induced by this ruling of August 20, 1947.

There is no finding that the Veterans Administration or the doctors who examined and treated the insured prior to the August 20, 1947 ruling, acted fraudulently, negligently, or improperly in the handling of this case. We can not make such a finding here.

In view of the different rulings throughout the Circuits, as shown by the cases cited in Gossage v. United States, supra, and in order for this Court to have before it the exact question it is called upon to decide, I would remand this case to the District Court for amplification of its findings with respect to the factual questions referred to herein. Winnick v. Commissioner, 6 Cir., 199 F.2d 374; Maher v. Hendrickson, 7 Cir., 188 F.2d 700, 702; Polaroid Corp. v. Markham, 80 U.S.App.D.C. 225, 151 F.2d 89, 90; Compare: Kelley v. Everglades Drainage District, 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485.