**UNITED STATES v. KLINGER et al.**

No. 23, Docket 22387.

United States Court of Appeals
Second Circuit.

Argued Oct. 9, 1952.

Decided Nov. 3, 1952.

Berman & Berman and Frederic S. Berman, New York City, for Cantor and Klinger.

Louis Bender, New York City, for Sandler.

Robert Martin, New York City, Myles J. Lane, U. S. Atty., New York City, Thomas F. Burchill, Jr., Asst. U. S. Atty, New York City, of counsel, for U. S.

Before SWAN, Chief Judge, and L. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The only point. which we find it necessary to decide upon these appeals is whether the prosecution was barred by the Statute of Limitation. The convictions were under an indictment found on March 31, 1950, which charged the defendants with conspiracy to "defraud the United States";[1] that is, by "impairing, obstructing, or defeating the lawful function of any department of Government",[2] in this instance the rationing of sugar through the Office of Price Administration. It is not necessary to set out the evidence beyond saying that the prosecution did not prove that the conspiracy lasted beyond December 31, 1946; and that the result depends upon whether the three years period of limitation, which concededly applied to the crime,[3] began to run on January 1, 1947, or on January 1, 1950. The answer to that turns upon the following clause in the Act of 1944: "The running of any existing statute of limitations * * * shall be suspended until three years after the termination of hostilities in the present war as proclaimed by the President".[4] That act was an amendment of the first section of the Act of August 24, 1942;[5] and in 1948, when the Criminal Code as a whole was amended, that Act was itself put into general terms, as follows: "When the United States is at war the running of any statute of limitations * * * is * * * suspended" etc.;[6] and in that form it now appears as § 3287 of Title 18 of the United States Code, which went into effect on September 1,

1. § 371 (formerly § 88) Title 18 U.S.C.

2. Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 254, 54 L.Ed. 569.

3. § 3281, Title 18 U.S.C.

4. 58 St. at Large, p. 667.

5. 56 St. at Large, p. 747.

6. 62 St. at Large, p. 828.

1948.[7] If § 3287 had enlarged the period of limitation beyond the extension granted in 1944, it would govern this appeal, because the period fixed by the Act of 1944 had not expired in 1948; but the prosecution does not suggest that it did, and we shall confine our discussion to the Act of 1944.

If the words be read literally, there was no escape from holding that in computing the period of limitation of three years, one should start on January 1st, 1950, and not on January 1st, 1947; and it would of course follow that, for any crimes of the kind described, an indictment might be found at any time before January 1, 1953. On the other hand, if the clause was the same as though it read: "the bar of the statute is suspended until three years" etc., the period of limitation expired on December 31, 1949, and the indictment was too late. The word, "running," is a colloquial term, not a "word of art," coined *ad hoc,* and it does not appear to us that in this setting it so inexorably excludes the meaning, "bar," that it will not bear that construction, if only so will the purpose of the Act as a whole be realized, and consequences avoided that Congress certainly would not have tolerated. We concede that in the Act of 1942,[8] which we quote in the margin, "running" did not mean "bar"; but that it was used to toll the statute of limitations until July 1st, 1945, or some earlier date; and our interpretation does therefore involve the assumption that Congress used the word in a different sense in 1944. The strength, and the only strength, of the prosecution's argument is that we should not make that assumption, but should accept the literal meaning of the word; and to this we should yield, were it not that, (1), the construction we adopt preserves the original purpose of the Act of 1942 to extend existing periods of limitation only by the time which should elapse before the declared termination of hostilities; and that, (2), if the Act of 1944 in addition more than doubled the existing period of limitation for crimes committed before January 1st, 1947, a situation resulted, which we cannot imagine that Congress would have countenanced.

In United States v. Smith, 342 U.S. 225, 72 S.Ct. 260, the Supreme Court by a vote of five to four decided that the Act of 1944 did not apply to crimes committed between December 31, 1946 and January 1st, 1950; that is, that as to such crimes the "bar" of the statute was not suspended, and fell at the end of three years after they were committed. Not only was this the actual decision of all five of the justices, but the joint opinion of four leaves no doubt that they construed "running" as "bar," though it is true that they did not use that locution. The nub of their opinion was as follows, 342 U.S. at page 229, 72 S.Ct. at page 262: "The prosecution would have us change the function of the date of termination of hostilities. It would * * * provide various periods of suspension for crimes committed within the three-year period commencing with the termination of hostilities. That seems to us to be an alteration in the statutory scheme, one that destroys its symmetry. Since under our construction the three-year period prescribed by the Suspension Act starts to run at the date of termination of hostilities, all crimes to which the Act is applicable are treated uniformly. The time when law enforcement officers were busy with war activities is not counted; when the pressure was off, the time begins to run again. No reasons of policy are suggested for straining the language of the Act to suspend the running of the statute beyond the emergency which made the suspension seem advisable." That can only mean that

---

7. 62 St. at Large, p. 862, § 20, 18 U.S.C.A. note preceding section 1.

8. "The running of any existing statute of limitations applicable to offenses involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner, and now indictable under any existing statutes, shall be suspended until

June 30, 1945, or until such earlier time as the Congress by concurrent resolution, or the President, may designate. This Act shall apply to acts, offenses, or transactions where the existing statute of limitations has not yet fully run, but it shall not apply to acts, offenses, or transactions which are already barred by the provisions of existing laws."

"three-year period" which "starts to run at the date of termination of hostilities" is the period prescribed for limitation; it cannot cover a preliminary term of three years before the period of limitation begins; for, if so, the prosecution would not have been barred. The minority opinion shows that this is how these four justices understood the others; for it takes issue with precisely that interpretation, saying, 342 U.S. at page 231, 72 S.Ct. at page 263: "Until that time" December 31, 1949, "there was to be no statute of limitations. On that date the suspension was lifted, and the statute began to run again. The Court's construction that the suspension was lifted at the termination of hostilities gives no effect to the three-year period." Hence the minority opinion gives no indication of how the four justices who concurred in it, would vote upon the question now at bar, assuming, as we should, that they would accept the actual decision of the Court that the Act did not apply to crimes committed between January 1st, 1947, and December 31st, 1949. Forced, as by hypothesis we are to assume that they would feel themselves to be, to hold that there *was* a statute of limitations before January 1st, 1950, at least as to some crimes; and that as to these it did not begin "to run *again*" on that day, we have no warrant for supposing that they would hold that, crimes committed before January 1st, 1947, might be prosecuted at any time before January 1st, 1953, although those committed between January 1st, 1947 and January 1st, 1950, must be prosecuted before that date. It is true that Justice Clark in his separate opinion, 342 U.S. at page 231, 72 S.Ct. at page 263, did make such a distinction when he said that Congress meant to give the prosecution six years after December 31, 1946 within which to indict for crimes committed "between the date of the 1942 Act" August 24, 1942, and December 31, 1946; but only three years after December 31, 1946, to indict for crimes committed before August 24, 1942,—to which could be added any part of the period of limitation which had not expired on August 24, 1942. Since,

as we have shown, the four justices in the majority thought otherwise, we should not be warranted in assuming that the dissenting four would not accept their view. It seems to us therefore that we must choose between the views of the four and the argument of the prosecution, and, as res integra, we believe that, both from the language of the Senate Reports and the consequences that would otherwise ensue, the Act of 1944 used "running" in the sense of "bar."

The Senate Report[9] which accompanied the Act of 1942, declared that its "purpose" was "to suspend any existing statutes * * * applicable to * * * defrauding the U. S. * * * for the period of the war. * * * action should be taken * * * to extend the limitation statute so that frauds may be discovered and punished even after the termination of the present conflict and to insure that the limitations statute will not operate under stress of the present-day events." It was assumed that, if "the law-enforcement branch of the Government" had three years after June 30, 1945 or earlier, that would be time enough to "discover" any frauds which might have escaped detection, bello flagrante. The war was then only about nine months old, and by 1944 its demands upon our resources, in personnel as well as in materiél, may have become so great that, although three years after the "shooting war" had ended had originally been thought enough, double that time then appeared necessary. However, if Congress had so changed its mind, the Senate Report which accompanied the bill[10] gave no such indication, unless it was in the words: "It is clear that the bulk of the offenses * * * will not be apprehended or investigated until the end of the war and will then require considerable time before they advance to the stage of litigation." That language was certainly a most equivocal way of saying that accumulation of cases was so great that twice the time had become necessary to clear it up after "hostilities" had ended. And that aside, it would be unreasonable to impute to Congress a purpose to pass an

9. Senate Report No. 1544; 77th Congress 2nd Session.

10. Senate Report No. 1057; 78th Congress 2nd Session.

act providing that crimes, committed before "hostilities" had ended, should have a period of limitation made up of all the time that has elapsed before that date, plus twice the period allowed for crimes committed after "hostilities" ended. All the crimes equally became a part of "the bulk of offenses cognizable under this statute" with which the "law-enforcement branch" had to deal after December 31, 1946; and there was no reason to suppose that the later crimes would be "apprehended or investigated" before the earlier. Indeed, so far as any speculation whatever is in order, it would be that the earlier offenses would be earlier discovered. Moreover, all such crimes would be equally injurious to the interests of the United States, so that we must not suppose that Congress would be more lenient as to a part of them than as to the rest. For these reasons we cannot see why, once it is settled that "running" means "bar" as to crimes committed after the "termination of hostilities," it does not mean the same thing as to crimes committed before, or to suppose that Congress meant to give the "law-enforcement branch" twice the time to detect the second that it was to have to detect the first.

We have not considered any of the other decisions upon the Act of 1944, because those decided before January 7, 1952, were superseded, when United States v. Smith, supra, was handed down, and so far as we know, the question has come up only once since that time—United States v. Showalter, D.C., 103 F.Supp. 806—although it is quite true that there the court took the contrary view to ours. We agree that the issue is not free from doubt; all we can say is that the reasoning in that case does not persuade us. The issue involves the baffling question which comes up so often in the interpretation of all kinds of writings: how far is it proper to read the words out of their literal meaning in order to realize their overriding purpose? It is idle to add to the acres of paper and streams of ink that have been devoted to the discussion. When we ask what Congress "intended," usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion. He who supposes that he can be certain of the result is the least fitted for the attempt.

Judgment reversed; indictment dismissed.