# UNITED STATES *v.* HENNING ET AL.

No. 10.   Argued April 1, 1952.—Reargued October 14, 1952.—
Decided November 17, 1952.

*Morton Liftin* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Baldridge* and *Samuel D. Slade.*

*Richard H. Lee* argued the cause for Kennedy, Administrator, respondent. With him on the brief was *Arthur V. Getchell.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Conflicting claims to the proceeds of a policy of National Service Life Insurance frame the controversy before us. Disposition of the cause depends on our interpretation of the National Service Life Insurance Act of 1940, as amended, 38 U. S. C. § 801 *et seq.,* which in pertinent part [1] provides:

> § 602 (g). "The insurance shall be payable only to a widow, widower, child . . ., parent, brother or sister of the insured. The insured shall have the right to designate the beneficiary or beneficiaries of the insurance, but only within the classes herein provided . . . ."

---

[1] In 1946, the Act was amended prospectively in several material respects. 60 Stat. 781 *et seq.* Since the policy before us matured in 1945, the 1946 amendments do not govern the distribution of the proceeds here in issue.

§ 601 (f). "The terms 'parent', 'father', and 'mother' include a father, mother, father through adoption, mother through adoption [and] persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year . . . ."

§ 602 (i). "If no beneficiary is designated by the insured or if the designated beneficiary does not survive the insured, the beneficiary shall be determined in accordance with the order specified in subsection (h)(3) of this section and the insurance shall be payable in equal monthly installments in accordance with subsection (h) . . . . The right of any beneficiary to payment of any installments shall be conditioned upon his or her being alive to receive such payments. No person shall have a vested right to any installment or installments of any such insurance and any installments not paid to a beneficiary during such beneficiary's lifetime shall be paid to the beneficiary or beneficiaries within the permitted class next entitled to priority, as provided in subsection (h) . . . ."

§ 602 (h)(3). "Any installments certain of insurance remaining unpaid at the death of any beneficiary shall be paid in equal monthly installments in an amount equal to the monthly installments paid to the first beneficiary, to the person or persons then in being within the classes hereinafter specified and in the order named, unless designated by the insured in a different order—

.        .        .        .        .

"(C) if no widow, widower, or child, to the parent or parents of the insured who last bore that relationship, if living, in equal shares; . . . ."

§ 602 (j). "No installments of such insurance shall be paid to the heirs or legal representatives as such of the insured or of any beneficiary, and in the event that no person within the permitted class survives to receive the insurance or any part thereof no payment of the unpaid installments shall be made. . . ."

The material facts are not disputed. Eugene C. Henning, a Naval Reservist insured under a $10,000 term policy of National Service Life Insurance which named his father as sole beneficiary,[2] died on July 4, 1945, in his country's service. Otto F. Henning, the father, died five months later, without having received any part of the policy's proceeds. Bessie, his second wife and the insured's stepmother, and Clara Belle, his former wife and the insured's natural mother, survived. Both survivors subsequently filed claims to the proceeds of the serviceman's policy. On June 30, 1949, during the pendency of an interpleader action for a judicial determination of the proper taker, Bessie died, leaving the natural mother as sole surviving claimant. The Government thereupon asserted that Bessie had last borne the parental relationship to the insured; that consequently Clara Belle could not come within the statutory class of devolutionary takers; and that, in the absence of cognizable claims to the proceeds, they escheat to the National Service Life Insurance Fund.

The District Court's judgment, however, divided the proceeds, payable in installments, among three parties.[3] The court read the statute as imposing no bar to the

---

[2] The insured at one time had designated his wife as beneficiary and his father as contingent beneficiary. Subsequently he properly changed this designation and named his father as sole beneficiary. The marriage was dissolved prior to the insured's death. The earlier designation is thus not material here.

[3] 93 F. Supp. 380 (D. Mass. 1950).

award of matured but unpaid installments to the estates of deceased beneficiaries. It therefore awarded to the father's estate the installments which had matured during his lifetime but remained unpaid. And, finding that Bessie, the stepmother, had stood *in loco parentis* to the insured for at least one year prior to his entry into active service, it concluded that both she and Clara Belle, the natural mother, were parents who "last bore that relationship" and thus qualified to take the remaining proceeds by devolution under § 602 (h)(3)(C) of the Act. The installments which had matured during the stepmother's lifetime were shared equally between her estate and Clara Belle; installments thereafter maturing were awarded to the latter alone.

The Court of Appeals agreed.[4] Conceding that the literal wording of the statute went "a long way" toward sustaining the Government's opposing contentions, the court, fearful of unfortunate consequences that might flow from strict adherence to the text of the Act, nevertheless ruled that estates of deceased beneficiaries might take. And, noting its disagreement with the Second Circuit's ruling in *Baumet* v. *United States,*[5] it further held that one *in loco parentis* who qualified as a beneficiary under § 602 (h)(3)(C) of the Act did not necessarily exclude from participation in policy proceeds a natural parent of the same sex who also "last bore" the parental relationship to the insured.

We granted certiorari to settle problems important in the administration of the National Service Life Insurance

---

[4] 191 F. 2d 588 (1st Cir. 1951). The Court of Appeals reversed and remanded for proper computation of the installments which it found due the various parties. In view of our disposition of the case, we are not now concerned with that part of its holding.

[5] 191 F. 2d 194 (1951), cert. granted, 343 U. S. 925, decided this day, *post,* p. 82.

Act and to resolve conflicting statutory interpretations by the Courts of Appeals. 342 U. S. 917.

Congress through war risk insurance legislation has long sought to protect from financial hardship the surviving families of those who had served under the nation's flag. Comprehensive insurance programs enacted in 1917, 1940, and 1951 reflect this consistent legislative concern in times of crisis. Since public funds were to meet a large part of the programs' cost,[6] the statutes closely circumscribed the class of permissible takers to preclude those not the object of congressional concern from draining the treasury when hazards of war service multiplied policy maturities. The War Risk Insurance Act of 1917 enumerated only the serviceman's spouse and immediate blood relatives as permissible beneficiaries of policy proceeds;[7] a beneficiary's interest was extinguished by death.[8] The National Service Life Insurance Act of 1940, again constricting the class of permissible takers,[9] restates the legislative purpose of the prior Act. In the Servicemen's Indemnity Act of 1951 the previous restrictions once more appear, reiterated in a flat proviso: "No payment shall be made to the estate of any deceased person."[10] Accenting these wartime limitations is the liberalizing legislation by which Congress after cessation of hostilities in World Wars I and II placed its insurance programs on more nearly a commercial basis. Amend-

[6] *E. g.,* § 403, W. R. I. A. of 1917, 40 Stat. 410; § 602 *et seq.,* N. S. L. I. Act of 1940, 38 U. S. C. § 802 *et seq.,* see *United States* v. *Zazove,* 334 U. S. 602, 616 (1948); Servicemen's Indemnity Act of 1951, 38 U. S. C. (Supp. V) § 851 *et seq.;* S. Rep. No. 91, 82d Cong., 1st Sess.; H. R. Rep. No. 6, 82d Cong., 1st Sess.

[7] § 402; 40 Stat. 409.

[8] *Cassarello* v. *United States,* 271 F. 486; *Salzer* v. *United States,* 300 F. 764.

[9] § 602 (g); 38 U. S. C. § 802 (g).

[10] § 3; 38 U. S. C. (Supp. V) § 852.

ments to the War Risk Insurance Act in 1919 expanded the permitted beneficiary class to include more distant relatives of the insured, and, significantly, provided that installments payable but unpaid upon a beneficiary's death might go to his estate.[11] This broadening legislation was substantially reenacted in the World War Veterans' Act of 1924.[12] And after World War II, Congress in 1946 once more liberalized the benefits of the National Service Life Insurance Act. As to policies maturing after August 1946 it removed the restrictions on the insured's choice of beneficiary, and in certain instances permitted the payment of installment proceeds to deceased beneficiaries' estates.[13] From this course of legislation an unmistakable pattern of congressional policy emerges: Statutes enacted in time of war crisis narrow the range of beneficiaries; post-war legislation broadens it.[14]

Section 602 of the N. S. L. I. Act of 1940, governing the distribution of the policy proceeds here in controversy, must take meaning from its historical setting. Cf. *United*

[11] §§ 4, 13, 19; 41 Stat. 371, 375, 376.

[12] §§ 3, 26; 43 Stat. 607, 614; 38 U. S. C. §§ 424, 451.

[13] §§ 4, 9; 60 Stat. 782, 785; 38 U. S. C. §§ 802 (g), (u).

[14] As to the 1946 amendments, see testimony of Mr. Harold W. Breining, Assistant Administrator for Insurance, Veterans' Administration, Hearings before the Subcommittee on Insurance of the Committee on World War Veterans' Legislation, House of Representatives, 79th Cong., 2d Sess., on H. R. 5772 and H. R. 5773 (p. 1):

"The fundamental reasons for liberalization are that during the war the bulk of losses all came from the National Treasury. Through this method the Government assumed the losses due to the extra hazards of military and naval services. Since the Government during the war bore the major part of the losses it was not felt that the Government would want to pay, indirectly through this channel, large sums of money to persons who might be beneficiaries only because of some speculation, or because the insured might wish to give it to them as distinguished from persons who were likely to be dependent or to whom the insured might owe some semblance of a moral obligation. These restrictions originally were placed in the law with the

*States* v. *Zazove,* 334 U. S. 602 (1948). Subsection (i) conditions the right of a beneficiary to the payment of any installments "upon his or her being alive to receive such payments"; it adds that "no person shall have a vested right to any installment . . . and any installments not paid to a beneficiary during such beneficiary's lifetime shall be paid to the beneficiary or beneficiaries within the permitted class next entitled to priority . . . ." And subsection (j), so as to disclaim any possible analogy to prior peacetime legislation which at one time had been construed to confer such rights,[15] emphasizes that "no installments of such insurance shall be paid to the heirs or legal representatives as such of the insured or of any beneficiary." On the contrary, the subsection directs "in the event that no person within the permitted class survives to receive the insurance or any part thereof no payment of the unpaid installments shall be made."

In the face of this clear statutory language we are nevertheless urged to distinguish installments neither accrued nor paid from accrued installments that an intended beneficiary for some reason has not received. Whereas

---

clear intent that they would be eliminated when the period of the emergency was over."

For congressional attitudes in enacting the W. R. I. A. of 1917, see, *e. g.,* 55 Cong. Rec. 6761, 7690, and H. R. Rep. No. 130, 65th Cong., 1st Sess., Pt. 3, p. 5. The legislative history of the 1940 Act contains little expression of congressional intent. The Act was presented while a controversial revenue measure was under consideration. The Committee reports accompanying the revenue bill of which the N. S. L. I. Act became part contain no reference to the insurance legislation. A Conference Committee Report devoted less than a page to the Insurance Act. See H. R. Rep. No. 2894, S. Rep. No. 2114, H. R. Rep. No. 3002, all of the 76th Cong., 3d Sess.

[15] *McCullough* v. *Smith,* 293 U. S. 228 (1934); cf. *United States* v. *Citizens Loan & Trust Co.,* 316 U. S. 209 (1942), both cases involving the 1925 amendments to the World War Veterans' Act. 43 Stat. 1310, 38 U. S. C. § 514.

the former concededly may not pass to the estate of a deceased beneficiary, it is argued that the latter may. For to hold otherwise, the argument runs, might result in "amazing consequences"; the government, for example, by simply withholding payments until one beneficiary died might unjustly enrich another in a lower priority, or, if none survived, favor the public purse; moreover, a low-priority beneficiary by litigating a specious claim might profitably suspend payment until the higher-priority takers died.

We reject the conclusion and its premises. The asserted distinction assumes that when Congress in § 602 (i) conditioned payment to beneficiaries on their "being alive to receive such payments" it meant something else; that it exempted, without words or other indication, installments accrued but not yet paid. But to read such language into subsection (i) strips it of significance; if limited in application to unmatured installments the strictures of that subsection would be mere surplusage, forbidding what the priority ladder of § 602 (h) (3) in any event could not logically permit. We cannot so nullify the clear import of subsection (i). In drafting the 1940 statute, Congress must have been fully cognizant of insurance legislation of the prior war. The 1917 War Risk Insurance Act was well understood to prohibit payment of accrued installments to the estates of beneficiaries who did not live to take their intended shares; [16] the very contention made here today was then examined and rejected.[17] No peacetime amendments, as those which in

---

[16] Treasury Dept., Bureau of War Risk Insurance, Division of Military and Naval Insurance, Bulletin No. 1, p. 4 (1917); *Cassarello* v. *United States,* 271 F. 486 (1919).

[17] 24 Comp. Dec. 733 (1918). Cf. *American National Bank & Trust Co.* v. *United States,* 77 U. S. App. D. C. 243, 134 F. 2d 674 (1943); *United States* v. *Lee,* 101 F. 2d 472 (1939), which interpreted 38 U. S. C. § 516, providing for reinstatement of lapsed World War I

1919 and 1924 specifically altered the deliberate wartime result, can aid the contention presented today.[18] The conclusion is irresistible that when in 1940 the law conditioned payments on the beneficiary's *being alive to receive* them, Congress said what it meant and meant what it said. Were more needed, the consistent course of administrative practice under the Acts of 1917 and 1940 applied the statutes to bar payments to deceased beneficiaries' estates;[19] that factor, too, must be accorded weight. *United States* v. *Zazove, supra; United States* v. *Citizens Loan & Trust Co.*, 316 U. S. 209 (1942); *United States* v. *Madigan*, 300 U. S. 500 (1937). We are not unmindful of the fact that unanticipated delay in the payment of policy proceeds may withhold from a beneficiary the funds that Congress intended him to get; seven years and three deaths have not yet brought this litigation to an end. But we cannot apportion the blame for this cruel delay. And we may surely not speculate that the officials entrusted with the administration of the Act would attempt to enrich other beneficiaries or the treasury itself by a sardonic waiting game.

We conclude that in this crisis legislation Congress, fully aware of the sometimes inevitable delays in pay-

---

policies, as forbidding the payment of installments to the estates of deceased beneficiaries. These holdings turned on the section's enumeration of a restricted class of permissible takers; estates of deceased persons were held not to fall within that class. The pertinent terms of that enactment are almost identical with portions of §§ 602 (g) and (h) of the National Service Life Insurance Act we must construe today.

[18] Since this policy matured in 1945, we are not here concerned with whatever effects the 1946 amendments to the National Service Life Insurance Act might have on this or similar cases.

[19] See 24 Comp. Dec. 733 (1918); Bulletin, note 16, *supra;* Communication to the Solicitor General of the United States from the Solicitor, Veterans' Administration, dated March 12, 1952, reprinted as Appendix B, Brief for the United States.

ment, preferred the occasionally harsh result to a course of action which would permit funds intended for living members of the narrow statutory class of permissible takers to seep down to an enlarged class of sub-beneficiaries created not by the Act itself but by intended beneficiaries' testamentary plans. Courts may not flout so unmistakable a legislative purpose, expressed in so clear a congressional command. *United States* v. *Citizens Loan & Trust Co., supra; Wissner* v. *Wissner,* 338 U. S. 655 (1950). We hold that the award of accrued installments to the estates of deceased beneficiaries cannot stand.

There remains the controversy between the natural mother and the United States. The Government contends that because Bessie, the stepmother, had stood *in loco parentis* to the insured at the time of his death, she was *the* maternal parent "who last bore that relationship" within the meaning of § 602 (h)(3)(C); consequently Clara Belle, the natural mother, despite a District Court finding that she, too, "last bore that relationship," was displaced and forever lost any right to take by devolution under the Act. In essence, the argument is that no more than one parent of each sex may contemporaneously meet the test imposed by the Act; the "last" parent takes all, to the exclusion of others. And since *the* "last" parent is now dead, no one may take.

We cannot agree. While the contention has the merit of simplicity, simplicity cannot supplant statutory interpretation. Section 602 (h)(3)(C), too, has a historical setting. The National Service Life Insurance Act as enacted in 1940 confined the class of devolutionary takers to the spouse and blood relatives of the insured.[20] So written

---

[20] §§ 602 (g) and (h)(3)(C), 54 Stat. 1010. The insured, however, was permitted to designate persons *in loco parentis* as beneficiaries.

the legislation proved unsatisfactory in practice. As construed, that provision required payment of proceeds to an insured's natural parents though they had abandoned him to be raised and supported wholly by foster parents, the latter being excluded from participation by the Act.[21] Upon recommendation of the Veterans' Administrator, Congress in 1942 amended the Act to foreclose that result. Persons who stood *in loco parentis* to the insured for at least one year prior to his entry into active military service were included within the Act's definition of "parent." And they qualified as takers by devolution if they "last bore that relationship" to the insured,[22] an essential statutory condition to preclude the parceling out of proceeds among a series of transient hosts and to assure full benefits to those most likely to merit the insured's financial support. The thrust of the amendment thus was directed at the inclusion of worthy foster parents, not the exclusion of natural parents however deserving.

It may well be that ordinarily a foster relationship does not begin until natural parental ties, realistically viewed, are severed; if so, the foster parent bears the parental relationship when the natural parent has ceased to be such in truth and fact. And in that case, the clear intent of the 1942 amendments would demand the exclusion of the natural parent from participation in the proceeds. But since that determination, based on realities, not status, necessarily must depend on the facts of a particular case, it is peculiarly within the competence of others who are closer to the living facts. Here the District Court found that the parental relationship con-

---

[21] S. Rep. No. 1430, 77th Cong., 2d Sess., p. 2; H. R. Rep. No. 2312, 77th Cong., 2d Sess., p. 4. Cf. S. Rep. No. 91, 82d Cong., 1st Sess., p. 12; H. R. Rep. No. 6, 82d Cong., 1st Sess., p. 14.

[22] §§ 7 to 9, 56 Stat. 659; 38 U. S. C. §§ 801 (f), (g), and (h) (3) (C). Cf. § 3 of the Servicemen's Indemnity Act of 1951, 38 U. S. C. (Supp. V) § 852.

tinued until the insured's death, and the Court of Appeals observed that "there is no finding or evidence of any estrangement, to say nothing of abandonment, or even any lack of parental feeling, between [the insured] and his mother, Clara Belle." [23] Unable to freeze into formula the subtle family relations that may constitute a genuine parental bond, we must accept what the courts below deemed a continuing parental relationship between mother and son.

Since we hold that Clara Belle Henning, the insured's natural mother, is a surviving beneficiary entitled to take by devolution under § 602 (h)(3)(C), the Government may of course not invoke the provisions of § 602 (j) to withhold, for the benefit of the National Service Life Insurance Fund, payment of the installments accrued from the date of the insured's death. It equally follows that the method of distribution of installments to Clara Belle, as "the beneficiary to whom payment is first made," must depend on her age at the date of policy maturity, subject to her election of an optional settlement as provided by § 602 (h)(1) and (2) and applicable administrative regulations under the Act.[24]

*Reversed.*

MR. JUSTICE BURTON, with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part.

I agree with the opinion and the judgment of the Court insofar as it holds that no installments may be paid to the legal representatives of the estates of the respective deceased beneficiaries. However, I feel obliged to conclude that, within the meaning of the Act, only the natural father and the foster mother of the insured *last*

---

[23] 191 F. 2d, at 593.

[24] 38 U. S. C. § 802 (h)(1) and (2); 38 CFR, 1944 Supp., § 10.3475 *et seq.*, applicable to this policy which matured in 1945.

bore to him, at the time of his death, the relationship of parents. That *last* relationship was then to the exclusion of everyone, even to the exclusion of his natural mother. Consequently, upon the death of those two persons who *last* bore the relationship of parent to the insured, there remained no person entitled under the terms of the Act to receive any of the proceeds as a contingent beneficiary. Accordingly, the proceeds should be withheld for the benefit of the National Service Life Insurance Fund.

MR. JUSTICE JACKSON, whom MR. JUSTICE FRANKFURTER joins, dissenting.

Perhaps a halfhearted dissent, like an extemporaneous speech, is only worth the paper it is written upon. We do no more than point out that we would prefer a more benign construction of these complex statutes which would be equally reasonable.

The problem is of that recurring sort well described by Judge Learned Hand as follows:

> "The issue involves the baffling question which comes up so often in the interpretation of all kinds of writings; how far is it proper to read the words out of their literal meaning in order to realize their overriding purpose? It is idle to add to the acres of paper and streams of ink that have been devoted to the discussion. When we ask what Congress 'intended,' usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion. He who supposes that he can be certain of the result, is the least fitted for the attempt." *United States* v. *Klinger,* 199 F. 2d 645, 648.

The literal language of Congress in 38 U. S. C. § 802 (i) we would read with emphasis as follows: "The *right* of any beneficiary to payment of any installments shall be conditioned upon his or her being *alive to receive such payments.*" This, on our reading, says that a beneficiary's claim to an installment is matured and his right is perfected when the installment becomes due and he is alive to receive it whether or not he then actually reduces it to possession. Under the Court's construction, no "right" to an installment comes into existence until the claimant has actually received payment. On that event, we would think he would cease to have the "right." It is not clear what the Court would do about the case where a check was sent to pay the claim and the claimant died while it was in the mails or after he had received the check but before it was actually presented for payment. But to us this language means that installments accrue to a beneficiary when they fall due during his lifetime and thereupon become his of right.

We do not read § 802 (j) as taking away what § 802 (i) grants. It may be read with this emphasis: "No installments of such insurance shall be paid to the heirs or legal representatives *as such* of the insured or of any beneficiary . . . ." Just what "as such" adds or subtracts may be debated, but to us the phrase, if it is to have any significance in this context, means that payments cannot *accrue* to an administrator or executor, because a personal representative *as such* cannot become a beneficiary. But it does not mean that the personal representative cannot collect installments which had become the "right" of decedent during his lifetime.

This construction would avoid what the Court admits is a harsh and capricious result. It seems strange, in dealing with a bereaved beneficiary, if our Government makes a promise to the ear to be broken to the hope. Under the Court's view, though the beneficiary is alive

to receive the payment and therefore has the statutory "right" to it, any event that delays its actual payment may cancel his "right." By an adverse claim, however fictitious, or a litigation, however frivolous, a junior beneficiary may delay payments and gamble on winning them for himself through death of the senior beneficiary. Some period of waiting is inevitable in the settlement of claims in any event, and we all know the tendency of claim papers to shuffle back and forth between Washington desks while time, which means little to the administrative staff, means everything to the claimant. We would not put upon beneficiaries all risks caused by delay and thus make their statutory rights as contingent as lottery tickets. Beneficiaries of this class are often dependents, left in urgent need by death of the insured. When red tape or litigiousness delays the promised income, should not the beneficiary while waiting to hear from Washington have a firm right to accrued installments on which he or his estate could depend? The reasoning that would deny the asset to the estate may also deny the needy beneficiary credit.

We do not think that the Court's admittedly harsh result is the fairest permissible interpretation of this statute. We would allow the estate of a beneficiary to recover payments that fall due while the beneficiary is alive to receive them. On this point alone do we dissent.