**CONLEY v. UNITED STATES.**
No. 1450.

United States District Court
S. D. West Virginia,
Charleston Division.

Feb. 5, 1954.

Forest L. McNeer, Charleston, W. Va., for plaintiff.

A. Garnett Thompson, former U. S. Atty., Charleston, W. Va., Duncan W. Daugherty, U. S. Atty.; Huntington, W. Va., William T: Lively, Jr., Asst. U. S. Atty., Charleston, W. Va., for the United States.

PAUL, District Judge, sitting by designation in the Southern District of West Virginia.

Cassie B. Conley, as plaintiff, has instituted this action against the United States of America seeking to have the proceeds of a National Service Life Insurance Policy issued to Johnie Ingle Conley paid to the plaintiff as the father of Johnie Ingle Conley. The United States has filed its answer and has interpleaded certain other parties, who are uncles and aunts of the insured.

It appears that Johnie Ingle Conley, who will be hereafter referred to as the veteran, was born March 5, 1924, and entered the naval service of the United States on January 22, 1942. While in the service he was granted National Service Life Insurance in the amount of $10,000, effective as of April 1, 1942, .and he designated his mother, Goldie Mae Conley, as beneficiary. No contingent beneficiary was named.

Goldie Mae Conley, the designated beneficiary, died on October 17, 1943, before the insurance contract matured, and no other beneficiary was designated in the policy. The veteran was reported missing in action on January 17, 1944, and report of this fact was made to his grandparents, Mr. and Mrs. Charles I.

Richardson, Sr., and his aunt, Mrs. E. H. Richardson, as next of kin. After the lapse of one year the veteran was officially presumed dead, as of January 18, 1945. At that time his maternal grandparents, Mr. and Mrs. Charles I. Richardson, Sr., were living, but the former died in January, 1948, and the latter in March, 1948. Prior to their death neither of the grandparents had filed a claim for the proceeds of the insurance. The plaintiff, the father, filed his formal claim for the insurance in September, 1948. The veteran was unmarried and left no brothers or sisters. However, an investigation conducted by the Veterans Administration for the purpose of obtaining evidence as to the proper beneficiary of the proceeds of the insurance resulted in a disallowance of the plaintiff's claim on the ground that he was not the last person who had stood in *loco parentis* to the veteran prior to the latter's death.

The background of facts upon which this position of the Veterans Administration was taken and which is determinative of the issues in this case shows substantially the following:

The mother of the veteran was Goldie Mae Richardson, daughter of Charles I. Richardson, Sr., and she was married to the plaintiff, Cassie B. Conley, in 1919. Their son, the veteran, was born March 5, 1924. In 1932, when the child, Johnie Ingle Conley, was about eight years old, his mother came back to live in the home of her father, Charles I. Richardson, Sr., who appears to have been a man of substantial means and good standing in the community. It appears that the plaintiff, Cassie B. Conley, was addicted to excessive drinking and that he worked at his trade, which was that of a barber, irregularly and that he apparently was not able to maintain a home for his wife and child. When Goldie Mae Conley returned to her father's home in 1932, with her eight year old child, it seems that Cassie Conley also stayed at the home of Mr. Richardson for a short period, probably not exceeding several weeks, after which he left. It is not entirely clear from the evidence whether the plaintiff and his wife ever lived together thereafter, but apparently they did not. Goldie Mae Conley and the child continued from that time to live in her father's household up until the time when the boy entered the service in 1942, while the testimony seems to indicate that the plaintiff never returned to Mr. Richardson's home.

During the years between 1932 and 1942 Johnie Ingle Conley was supported by his mother and by his grandfather, Charles I. Richardson, Sr., in whose home the boy and his mother lived. This statement is subject to the following possible exception: The plaintiff testifies that in the year 1936, after he and his wife had separated but before they were divorced, a warrant was issued against him for non-support. He states that no judgment was ever entered on this warrant, but that when it came on for hearing he agreed to and did give to his wife $350 out of a larger sum which he had recently collected from cashing his soldier's bonus certificate and that he agreed to and did thereafter pay to his wife the sum of $20 a month for the support of his son, Johnie Ingle Conley. This testimony as to paying $20 a month thereafter for the support of the child I am compelled to disbelieve. The plaintiff was quite vague about this and could offer no proof whatever to support this statement, in the form of receipts for money paid, checks showing payment or anything of the sort. Goldie Mae Conley's sisters and brothers, who lived near-by their father's home where Goldie Mae Conley was living and who were in intimate contact with their sister from day to day, testified very definitely that they never heard of any such payments being made; that their sister never mentioned them and they are completely sure that no such payments ever were made. It also seems evident that the irregular employment of the plaintiff, due to his alcoholic habits, made him unable to have made any such monthly payments with any regularity whatever.

During all these years while he lived in his grandfather's home Johnie Ingle Conley received his support from his mother, aided in large measure by his grandfather. It was they who provided a home and food for him and bought all of his clothes and who supplied to him all of the needs and comforts and luxuries of his childhood years and who guided his training, both secular and spiritual. His mother paid for all of the expenses of his schooling, such as books, etc., and the school report cards were all brought to and signed by her. When the boy entered the navy in 1942, being slightly under eighteen, it was his mother who signed the consent to his enlistment. It was to the Richardson home that the veteran went whenever he returned on furlough during his service.

In 1938 Goldie Mae Conley procured a divorce from the plaintiff upon the grounds of desertion and under the terms of the decree she was given the custody of their son. At no time following 1932, so far as is shown, did the plaintiff ever come to see his wife or son at the home of Mr. Richardson, where they were living. The plaintiff testifies that he saw his son from time to time when the boy would pay visits to him at such place as the plaintiff was employed at the time. He says that on those occasions he frequently gave the boy money in small sums for some of his youthful needs, such as the price of admission to a ball game or something of that sort, and that on several occasions his son came to see him at the boarding house or other place where the father was living. This testimony is supported to some extent by one of the plaintiff's employers, who states that on several occasions in 1941 the son came to the barber shop where his father was employed and that on these visits their relationship appeared cordial. A nephew of the plaintiff states that during 1941 he worked in a restaurant near the place where plaintiff was then employed and that plaintiff and his son came together into the restaurant on a number of occasions; and that he went with Johnie Conley to the plaintiff's home on several occasions.

The following are the pertinent provisions of the statute relating to National Service Life Insurance:

38 U.S.C.A. § 802(g)

"The insurance shall be payable only to a widow, widower, child * * *, parent, brother or sister of the insured. The insured shall have the right to designate the beneficiary or beneficiaries of the insurance, but only within the classes herein provided * * *."

38 U.S.C.A. § 801(f)

"The terms 'parent', 'father', and 'mother' include a father, mother, father through adoption, mother through adoption, persons who have stood in loco parentis to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year * * *."

38 U.S.C.A. § 802(i)

" * * * The right of any beneficiary to payment of any installments shall be conditioned upon his or her being alive to receive such payments. No person shall have a vested right to any installment or installments of any such insurance and any installments not paid to a beneficiary during such beneficiary's lifetime shall be paid to the beneficiary or beneficiaries within the permitted class next entitled to priority, as provided in subsection (h) of this section. The provisions of this subsection shall not be applicable to insurance maturing on or after August 1, 1946."

38 U.S.C.A. § 802(h)(3)

"Any installments certain of insurance remaining unpaid at the death of any beneficiary shall be paid in equal monthly installments in an amount equal to the monthly installments paid to the first beneficiary, to the person or persons then in being within the classes hereinafter specified and in the or-

der named, unless designated by the insured in a different order—

"(A) to the widow or widower of the insured, if living;

"(B) if no widow or widower, to the child or children of the insured, if living, in equal shares;

"(C) if no widow, widower, or child, to the parent or parents of the insured who last bore that relationship, if living, in equal shares * * *."

38 U.S.C.A. § 802(j)

"No installments of such insurance shall be paid to the heirs or legal representatives as such of the insured or of any beneficiary, and in the event that no person within the permitted class survives to receive the insurance or any part thereof no payment of the unpaid installments shall be made * * *."

A consideration of the effect of these statutory provisions serves to define the issues in this case.

Section 802(g) designates and limits the persons to whom insurance may be payable and who may be named as beneficiaries in the policy. The veteran here, being unmarried and having no children, was limited to naming as beneficiary either one of his parents or both of them. He chose to name his mother alone.

But Goldie Mae Conley, the named beneficiary, died prior to the death of the veteran and this brings the provisions of Section 802(i) into play. Section 802(i) provides that in order to receive any part of the insurance the beneficiary must be alive, and (in effect) that the estate of the beneficiary has no rights in the insurance; and that any part of the insurance not paid to the beneficiary during the beneficiary's lifetime shall be paid to certain other permitted beneficiaries in the order of priority set out in Section 802(h)(3). See U. S. v. Henning, 344 U.S. 66, 73 S.Ct. 114, 97 L.Ed. 101.

Section 802(h)(3) provides that any insurance not paid at the death of the beneficiary shall be paid to persons with-in certain limited classes and in the following order of priority: (A) To the widow or widower of the insured, if living; (B) If no widow or widower, to the children of the insured, if living; (C) If no widow, widower or child, *to the parent or parents of the insured who last bore that relationship, if living.*

Section 802(j) provides that where no person within the permitted class survives to receive the insurance then no payment of the unpaid part of it shall be made.

It is clear, of course, that if the veteran's mother, the named beneficiary, had survived him she alone would have been entitled to the insurance payments as long as she lived. Neither the plaintiff, nor anyone else, could have claimed any part of the insurance. But when Goldie Mae died before the veteran, then disposition of the insurance must be determined by the provisions of Section 802(h)(3) and Section 802(i).

The significant language in Section 802(h)(3) is that which has been emphasized above, namely, "to the parent or parents * * * who last bore that relationship, if living". And these are to be considered along with Section 801 (f), which provides that the term "parent" includes any "persons who have stood in *loco parentis* to a member of the military or naval forces at any time prior to entry into active service for a period of not less than one year * * *."

It is the contention of the plaintiff, Cassie Conley, that under the terms of Section 802(h)(3) he is entitled to the insurance as the living parent of the veteran. To the contrary the government contends that the veteran's grandparents, Mr. and Mrs. Richardson, were the persons who last bore the relationship of parents to the veteran and who, if they were living, would be entitled to receive the insurance. But, it is urged that since neither Mr. or Mrs. Richardson is living, that, by virtue of Section 802(j), there is no one to whom the insurance can be paid. It may be noted that certain uncles and aunts of the veteran (children of Charles I. Richard-

son, Sr.) were interpleaded in the case on the supposition of a possible interest as heirs of Charles I. Richardson, Sr., and they filed an answer asserting a claim. However, this claim has not been pressed and I understand that these parties now accept the view that although their parents stood in loco parentis to the veteran, this furnishes no basis for a claim on their part in view of the provisions of Sections 802(i) and 802(j).

█ It is clear that the mere fact that Cassie Conley is the natural (the actual) father of the veteran is not sufficient to support his claim. The language of the statute, Section 802(h)(3) seems to make this clear when it speaks of "parent or parents * * * who last bore that relationship". There can be but one set of natural parents and these always hold that relationship. When, therefore, Congress spoke of parents *who last bore that relationship,* it clearly meant to include those who had stood in the relation of parents even though they were not the actual parents.

The two cases particularly pertinent are U. S. v. Henning, 344 U.S. 66, 73 S.Ct. 114, 97 L.Ed. 101, and Baumet v. U. S., 344 U.S. 82, 73 S.Ct. 122, 97 L.Ed. 111. In both of these cases it was held that where installments of insurance had accrued but the person legally entitled to receive them had died prior to receiving payment the insurance could not be paid to the estate of such person, because of the provisions of Section 802(i), which conditions payment on the beneficiary's *being alive to receive them.* It was these decisions which eliminated the claim of the Richardson heirs in the instant case. However, both the Henning and the Baumet cases deal with another question which is that upon the instant case turns; namely, the application of the language in Section 802(h)(3) "to the parent or parents * * * who last bore that relationship".

In the Henning case the facts were closely similar to those here. In that case the father of the veteran had been named as sole beneficiary in the policy, but the father had died five months after the veteran without having received any part of the policy's proceeds. Bessie, the father's second wife and stepmother of the veteran survived; as did also Clara Belle, the insured's natural mother from whom the father had been divorced. Both survivors claimed the `insurance. While there was pending an action for determination of the proper taker, Bessie died, leaving the natural mother as the only claimant. The government contended that because Bessie, the stepmother, had stood in *loco parentis* to the insured at the time of his death, she was the parent "who last bore that relationship" within the meaning of the statute; and that since Bessie was not alive the insurance escheated to the National Service Life Insurance Fund. The District Court, while finding that Bessie had stood in loco parentis, concluded that there had been no severance of the parental relationship between the veteran and his natural mother and that both she and Bessie were parents who "last bore that relationship". The Circuit Court agreed with this view. So also, in substance, did the Supreme Court, which held that the natural mother was entitled to take under Section 802(h)(3). In denying the government's contention, the court says: "In essence, the argument is that no more than one parent of each sex may contemporaneously meet the test imposed by the Act; the 'last' parent takes all, to the exclusion of others. And since *the* 'last' parent is now dead, no one may take. We cannot agree." 344 U.S. at page 76, 73 S.Ct. at page 120. Following its conclusion the Court held that Clara Belle, the natural mother, was entitled to the insurance as the person who last bore the parental relationship.

In its end result the Henning case favors the plaintiff here and he relies on it to support his claim. But it is made clear in the opinion that Clara Belle did not prevail merely because she was the natural mother. The Court, after discussing certain amendments made to the original Act, points out that their effect

is to require that a natural parent be excluded from participating in the insurance where the natural parent had ceased to bear the parental relationship "in truth and fact." Citing the findings of the District Court and the Court of Appeals, 1 Cir., 191 F.2d 588, to the effect that the parental relationship between Clara Belle and the insured had continued until the latter's death, the Court, 344 U.S. at pages 77, 78, 73 S.Ct. at page 120, says:

"But since that determination, based on realities, not status, necessarily must depend on the facts of a particular case, it is peculiarly within the competence of others who are closer to the living facts. * * Unable to freeze into formula the subtle family relations that may constitute a genuine parental bond, we must accept what the courts below deemed a continuing parental relationship between mother and son."

The case of Baumet v. United States, 344 U.S. 82, 73 S.Ct. 122 which is referred to in the opinion as a "companion case" to U. S. v. Henning, involved the same questions as the Henning case, but with a different result in so far as the claim of the natural parent was concerned. In that case one John J. Peters, an uncle of the insured, had been named as beneficiary in the policy. Following the death of the veteran, the natural father filed an action claiming the insurance proceeds and challenging the standing of the uncle as a permissible beneficiary. Before the action came to trial the uncle died. Upon a later trial the District Court found that the uncle and his wife, Julie Peters, had stood in loco parentis to the veteran for several years prior to his death and that the conduct of the natural father during this period had amounted to an abandonment of his son. It found that as a person in loco parentis the uncle was properly named as beneficiary, and the claim of the natural father was denied. The Court of Appeals affirmed. 2 Cir., 191 F.2d 194. The Supreme Court, after

modifying the holdings of the lower courts on certain matters not material here, approved the findings on the questions pertinent to the instant case. In this respect the court says, 344 U.S. at pages 84-85, 73 S.Ct. at page 124:

"In regard to the natural father's claim, the District Court's findings sharply reveal that William Baumet long before his son's death had 'abandoned his son' and ceased to be a parent in truth and fact. He may not now retrieve the discarded paternal robes to lay claim to the policy proceeds * * *. Since the foster parents, not he, 'last bore' the parental relationship, he cannot qualify as a taker by devolution under § 602(h) (3) (C) of the Act. For that reason we hold that the foster mother, Julie Peters, as the sole survivor of those who 'last bore' the parental relationship, in her own right must take all accrued policy proceeds."

Under the decisions in the two cited cases it is clear that the rights of the plaintiff in the instant case depend on the nature of the relations between him and the insured prior to the latter's death; whether the parental relationship had been maintained, or whether he had ceased to be a parent in truth and fact.

The substance of the evidence as to the relationship between the plaintiff and his son has hereinbefore been recited; it could not be added to except by a verbatim recital of the testimony. While there may be some lack of clarity as to a few details of minor importance, I am convinced of the following facts: That the plaintiff left his wife and child in 1932 when the latter was about eight years old; that beginning in 1932 the insured and his mother lived continuously in the house of the child's grandfather, and that the plaintiff never at any time after 1932 offered to make a home for his wife and son elsewhere or returned to visit them at the grandfather's home. It may be that at one time in 1936 the plaintiff, as he says,

gave his wife the sum of $350, but, with this exception, I am convinced that the plaintiff contributed nothing whatever to the support of the wife or child in the 10 years preceding the insured's death. The child's home was that of his grandparents and it was they who, together with his mother, furnished the things that went into his support and care; not only his physical care and comfort, but his guidance and training in every respect.

The most that can be said in support of the plaintiff's claim of a continuing parental relationship is that there is no evidence to indicate that there was any feeling of bitterness or hostility between the father and the son. And there is testimony that during the year or so before he entered the service the son occasionally dropped in the place where his father was employed and visited with his father; that on these occasions their relations were friendly, and that on the occasion of these visits the father at times gave his son small sums to be expended on some youthful pleasure.

There was in this case no abandonment of the son by the father in the sense that the father disavowed or repudiated the blood kinship, or that there was any antagonism or estrangement between them. But there was a complete abdication of all of the duties, obligations and responsibilities of a parent, including not only a failure to contribute in any way to the material necessities of the boy, such as food, clothing and shelter; but a like failure to take any part in, or show any concern for, the son's training or manner of life.

No good can come of trying to define the term "parental relationship" or to enumerate the many tangible and intangible components which enter into it. It is clear that mere blood kinship is not enough. To use the phrase applied by the court in the Baumet case, the plaintiff here had "ceased to be a parent in truth and fact" and cannot qualify to take the insurance as one who last bore the parental relationship. The persons who last occupied that status were the insured's grandparents (Mr. and Mrs. Richardson) and since neither of them is alive to receive payment, there is no one to take and the insurance escheats. 38 U.S.C.A. § 802 (h) (3) and Section 802(j).